SUSAN BELLOW, Plaintiff-Appellee, v. SAUL BELLOW, Defendant-Appellant.

First District (4th Division)    No. 61454

Opinion filed July 14, 1976.—Rehearing denied August 12, 1976.

Barry J. Freeman, of Freeman, Freeman & Atkins, Ltd., of Chicago, for appellant.

Jerome Berkson and Miles N. Beermann, both of Chicago, for appellee.

Mr. JUSTICE DIERINGER delivered the opinion of the court:

The defendant, Saul Bellow, appeals from a judgment of the Circuit Court of Cook County entered on July 25, 1974, setting aside the property settlement agreement with the plaintiff, Susan Bellow, which was incorporated in the judgment for divorce entered on February 14, 1968.

The issues for review are whether the findings of the court that the property settlement agreement was procured by fraud; whether awarding the plaintiff one-half of the funds withdrawn by the defendant from a joint account was against the manifest weight of the evidence; and whether the plaintiff is entitled to attorney's fees in an action to vacate a property settlement agreement under section 72 of the Civil Practice Act.

The property settlement agreement was executed on January 16, 1968, and gave the plaintiff, Susan Bellow, a lump sum amount of $115,000 in lieu of alimony, which included the $17,500 equity in their cooperative apartment and $7,000 in furnishings. The agreement was expressly based on a projected income of $30,000 per year for the defendant and a net worth of $250,000. In addition, the defendant agreed to pay $250 per month in child support for their four-year-old child, Daniel Bellow.

In December of 1971, Susan Bellow filed an amended petition under section 72 of the Civil Practice Act to set aside the property settlement portion of the divorce judgment. With respect to the contentions on appeal the plaintiff alleged that the agreement was predicated upon the fraud of the defendant in that he had knowingly and materially understated his projected income and net worth and also had misrepresented that he was the sole owner of the apartment when, in fact, he owned it with her in joint tenancy. She further alleged he had withdrawn the balance of $10,929.87 from their joint bank account even though she was the exclusive owner of one-half of that amount.

Property settlement negotiations with respect to the dissolution of the marriage began in 1967, and on October 10, 1967, the defendant's counsel wrote a letter to plaintiff's counsel indicating that Saul Bellow's income would fall off substantially in 1968 and succeeding years and proposed a lump sum tax-free settlement of $75,000 or alimony based on an income projection of $30,000 per year subject to adjustment for income fluctuations. The $30,000 figure was based on his University salary of $20,000 per year, a "dribble of royalties," and other miscellaneous items. The letter states in relevant part:

> "You have been informed that Mr. Bellow's royalties from the sale of the book, HERZOG, have declined this year from the first check of $80,000 to the second check received recently in the sum of only $2,500. Except for a dribble hereafter, this is the extent of the income from HERZOG. The income from other publications for which he is entitled to royalties is so modest as to be unworthy of consideration in this situation. Certainly it will be accounted for and reported in his tax returns as it has been heretofore.
>
> Mr. Bellow's future income is expected to be no more than approximately $30,000 per year beginning with the year 1968. This is made up from his salary from the University of Chicago of

approximately $20,000, a dribble of royalties, income from investments and such other miscellaneous income as may come along such as an occasional appearance, other than his work at the University of Chicago, for which he is paid to lecture.

If the matter is not settled with a waiver of alimony, Mr. Bellow is willing to pay whatever we can agree upon that is reasonable or that a Court may decide should be the amount of alimony and child support based upon $30,000 per year and subject to fluctuation, as is all ordinary alimony in Illinois, depending primarily upon the fluctuation of Mr. Bellow's income, but also depending upon such income as Mrs. Bellow may have. * * *

Under the foregoing circumstances, it must be noted that the apartment in which Mrs. Bellow now resides with the child is the sole property of Saul Bellow and he feels justified in his desire to dispose of that asset at the earliest possible moment * * *"

The record shows the defendant earned the following amounts from his literary efforts in the first months and years subsequent to the property settlement: in January of 1968, he earned $4,488; in February, $10,238 (including a $10,000 advance for "Mosby's Memoirs," a book of short stories); in March, $2,771; in April, $50,869 (including a $50,000 advance for an untitled novel which was later named "Mr. Sammler's Planet"); in May, $10,106; and in June, $15,008. From all sources, he earned $149,631 in 1968; $163,622 in 1969; and $169,165 in 1970. Prior to the publication of "Herzog" in 1964, the most money Saul Bellow earned was the $16,895 he reported on his 1963 income tax return. With the success of "Herzog" his income jumped to $89,670 in 1964; $79,157 in 1965; $90,085 in 1966; and $128,104 in 1967.

The property settlement agreement erroneously recited the defendant was the sole owner of the apartment when, in fact, it was owned in joint tenancy with the plaintiff. All through the negotiations he maintained he was the owner of the apartment, and in the letter quoted above, his divorce counsel represented to the plaintiff's counsel the apartment was in his name only.

The defendant testified at trial as follows:

"Well, I paid for it and I assumed that it was mine. Mr. Holleb [his attorney] advised me, as I recall now, to put it in joint tenancy for reasons of easier probate procedures if anything should happen to me and so I signed the paper Mr. Holleb gave me, but I never knew for a fact that Mrs. Bellow had also signed the document."

He further testified he did not have the documents relating to the possession of the property in his possession. When asked whether Mrs. Bellow had been given any consideration for her joint interest in the

property when computing the equity of $17,500, the defendant replied, "Nobody seemed to be aware of it."

The joint savings account in question was opened by the parties in either 1963 or 1964 with an initial deposit of $1500, and both parties signed the account card. A subsequent deposit of $9,000 was made with funds from a literary prize received by the defendant. He testified when the account was opened he intended it to be a kind of emergency account and told his wife if anything happened to him, she would have some ready cash in the bank. He stated he had kept the passbook in a safe-deposit box he had in the same bank. The plaintiff, on the other hand, testified she kept the passbook in her jewelry box until he asked her for it in the spring of 1967.

The defendant attempted to withdraw the money from the account in the spring of 1968 to pay his 1967 taxes, but found the plaintiff had placed a stop order on the account. A second attempt to withdraw the funds was successful. Nothing in the property settlement agreement specifically referred to the account.

In the summer of 1967, after suit for divorce had been filed, the defendant had given the plaintiff $2500 so she could spend the summer at Martha's Vineyard. She had agreed the amount was to be credited against the bank account when a property settlement was reached, and signed a letter to that effect.

The court found there had been misrepresentations made by the defendant with respect to the $30,000 projected income and the plaintiff had relied on the misrepresentations to her detriment. The court also found fraud had been practiced on the plaintiff with respect to the ownership of the apartment and found the plaintiff was entitled to one-half of the joint bank account, subject to a credit of $2500 on behalf of the defendant. The court made no finding regarding the representations of the defendant's net worth.

■■ The defendant contends the plaintiff did not prove by clear and convincing evidence there were intentional misrepresentations or concealment. The courts look with favor upon the amicable settlement of property rights and are reluctant to disturb decrees based on such settlements. (*Guyton v. Guyton* (1959), 17 Ill. 2d 439; *Walters v. Walters* (1951), 409 Ill. 298.) The burden of proving fraud cannot be established by mere suspicion and becomes particularly heavy when a party seeks to vacate or modify a property settlement incorporated in a judgment of divorce. (*Lagen v. Lagen* (1973), 14 Ill. App. 3d 74; *Garmisa v. Garmisa* (1972), 4 Ill. App. 3d 411.) The courts may also set aside a settlement agreement where inequity and unfairness in the terms of the settlement have been accomplished by some element of coercion or

misrepresentation. *Guyton v. Guyton* (1959), 17 Ill. 2d 439; *James v. James* (1958), 14 Ill. 2d 295.

The court heard and saw the witnesses, and found from the evidence, supported by the record, an intention by the defendant to mislead the plaintiff with respect to the income projection. This conclusion may be reached from the defendant's testimony and from the defendant's actual earnings both before and after the entry of the divorce judgment. When asked how the $30,000 figure was arrived at, the defendant testified:

"Well, it was an attempt to average out into the future as I had averaged back into the past. I arrived at this figure in consultation with Mr. Ehrlich [his divorce counsel]. Mr. Ehrlich seemed to feel that the lower the figure, the better."

The defendant received an income of over $14,000 in January and February of 1968, in addition to his University salary before the divorce judgment was signed. It was clear at that time the projected income would be exceeded even if there were no other sales of his works. In fact, there were subsequent sales which resulted in his income reaching nearly $150,000 in 1968. The speed with which other agreements worth many thousands of dollars were reached strongly suggests the defendant was well aware of his earning power. We also note the defendant's estimate of Federal income tax liability for 1968, filed on April 12, 1968, was fixed at $60,000.

We believe the expressed intention to minimize his projected income and the early indications of financial success together with an actual income almost five times the projected figure is sufficient to establish the settlement was both inequitable and based on the defendant's misrepresentations. The defendant contends the $30,000 figure was strictly conjectural in nature and was not to be relied upon, but we note it was specifically recited in the settlement agreement.

There was also sufficient evidence of an inequitable result with respect to the ownership of the apartment to sustain the finding of the trial court. The defendant and his attorney maintained the ownership was solely in the defendant's name, even though he testified he subsequently remembered placing the property in joint ownership. The law is clear that property taken in joint ownership with the wife raises a presumption a gift is being made of a one-half interest, even though all the money for purchase is supplied by the husband. (*Baker v. Baker* (1952), 412 Ill. 511; *Fraase v. Fraase* (1975), 29 Ill. App. 3d 281.) Here, there was no evidence of a clear and convincing nature which rebutted the presumption.

A similar result must be reached with respect to the joint bank account. The plaintiff testified she held the passbook in her jewelry box until he asked for it in 1967. The defendant testified he kept the passbook in his safety-deposit box, but that testimony conflicts with his declared intention

of making the account money an emergency fund for his wife if something should happen to him. That the plaintiff did not give up her right to her one-half ownership of the account is illustrated by the stop order she placed on the account when she discovered he was going to withdraw the money.

In reaching our decision we are aware the plaintiff had the benefit of able counsel all through the proceedings. We are reluctant to overturn the property settlement voluntarily entered into, and we are aware the effect of our judgment will be to give Susan Bellow the privilege of having both eliminated the risk of the defendant's uncertain future as well as taking advantage of his post-divorce success. Nevertheless, we find there is evidence to support the judgment of the trial court, and this court will not set aside the judgment and findings of the trial court unless they are against the manifest weight of the evidence. *Bilsky v. Bilsky* (1974), 18 Ill. App. 3d 329; *Murphy v. Murphy* (1975), 31 Ill. App. 3d 321.

■■ The defendant argues that because these proceedings did not seek to alter the marital status of the parties, the plaintiff, who came into court under a section 72 petition, is in the same position as a person seeking to set aside an ordinary contract (*Garmisa v. Garmisa* (1972), 4 Ill. App. 3d 134), and she is not entitled to attorney's fees as provided in section 15 of the Divorce Act.

We believe the fact a case comes to be heard by the procedural device of a section 72 petition does not alter the basic nature of the divorce action. The settlement agreement being litigated was incorporated in the decree of divorce, and became merged therein (*Page v. Page* (1961), 32 Ill. App. 2d 422, 426, wherein a property settlement was set aside). (Also see *James v. James* (1958), 14 Ill. 2d 295, 305.) Fees were allowed in a post-decree matter in *Walters v. Walters* (1951), 409 Ill. 298, 305, where the Supreme Court said:

> "Had the defendant complied with the terms of his agreement plaintiff would not be in court. It was his refusal to carry out its provisions which forced her to resort to the courts for relief. In such a situation the plaintiff should not be without her reasonable attorney's fees, a right accorded to her under the statute, and the referral by the Appellate Court for an order therefor was proper."

We see no difference between a post-decree action on the contract incorporated in the divorce decree and post-decree matters relating to custody or alimony modification, none of which go to the question of the divorce. All of the actions flow from the divorce and are part of the decree. A number of such cases have allowed fees as within section 15 upon the discretion of the court and the particular circumstances of each case. Among those cases are *Walters v. Walters; Kuhns v. Kuhns* (1972), 7

Ill. App. 3d 884; *Mabbatt v. Mabbatt* (1967), 78 Ill. App. 2d 455; *Kilbride v. Kilbride* (1965), 64 Ill. App. 2d 355. The plaintiff is entitled to the rights set forth in section 15 of the Divorce Act.

For these reasons, the judgment of the Circuit Court of Cook County is affirmed.

Affirmed.

JOHNSON, P. J., and BURMAN, J., concur.