SUSAN BELLOW, Plaintiff-Appellee, *v.* SAUL BELLOW, Defendant-Appellant.

First District (4th Division)    No. 79-436

Opinion filed March 19, 1981.

George S. Feiwell, Bernard Rivkin, A. Bruce Schimberg, Henry L. Mason, III, and Donald R. Cassling, all of Chicago (Feiwell, Galper & Lasky, Ltd., and Sidley & Austin, of counsel), for appellant.

Jerome Berkson and Beermann, Swerdlove, Woloshin & Barezky, both of Chicago (Miles N. Beermann, of counsel), for appellee.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

This case originated as a divorce action between Susan Bellow and Saul Bellow. In 1968, the parties entered into a property settlement in Illinois which was incorporated into the divorce judgment. Plaintiff filed a petition pursuant to section 72 of the Civil Practice Act (Ill. Rev. Stat. 1967, ch. 110, par. 72) to set aside the property settlement agreement. In July 1974, the trial court entered an order setting aside the agreement. That decision was affirmed by this court in *Bellow v. Bellow* (1976), 40 Ill. App. 3d 442, 352 N.E.2d 427.

Plaintiff then petitioned for temporary alimony and temporary child support. The trial court denied defendant's motion for summary judgment which was based on plaintiff's failure to restore $130,000 she previously had received under the rescinded settlement agreement. The trial court also awarded temporary alimony and temporary child support, while holding defendant in contempt of court. This court affirmed the alimony and child support awards, postponed consideration of the restitution issue and reversed the finding of contempt. (*Bellow v. Bellow* (1979), 72 Ill. App. 3d 608, 391 N.E.2d 29.) At the same time, plaintiff moved for an award of permanent alimony, attorneys' fees and for leave to change residence to New York with the minor child, Daniel. Defendant cross-petitioned and again moved for judgment on the restitution issue. The trial court denied defendant's motion for summary judgment and for custody but granted plaintiff's petition for leave to remove to New York.

In August 1978, the trial court awarded alimony in gross of $665,552.73 and ordered payment in the amount of $500,000, after allowing credits of $165,552.73. The following month, the trial court awarded attorneys' fees in the amount of $200,000. The court simultaneously increased child support from $650 to $800 per month.

Defendant filed a motion for reconsideration, with supporting exhibits, and also submitted a memorandum of law setting forth possible tax consequences of the trial court's order. In March 1979, the trial court denied defendant's motion and struck the supporting exhibits and the tax memorandum from the record.

Defendant appeals from the awards of alimony, child support and attorneys' fees, as well as the trial court's denial of his motion for reconsideration. The defendant additionally challenges the court's striking the

tax memorandum and financial exhibits from the record. He raises the issues of (1) whether the trial court's alimony and child support awards were based on the proper criteria and are in the proper amounts; (2) whether the trial court's award of attorneys' fees was excessive and an abuse of discretion; and (3) whether the trial court erred in refusing to require plaintiff to restore funds she received under the vacated 1968 property settlement agreement.

Plaintiff and defendant were married December 10, 1961. Seven years later, after five years of marital living together, they were divorced. Defendant earned approximately $6000 during the first year of their marriage. The couple initially resided in Tivoli, New York.

In 1962, defendant began employment with the University of Chicago, as an instructor, at a salary of between $14,000 and $16,000. The first marital residence in Chicago was with plaintiff's parents. During 1964, their only child, Daniel, was born. Subsequently, an apartment was rented near the University of Chicago.

Between 1961 and 1964, defendant produced the novel *Herzog*, for which he received a $10,000 advance. Additional apartment space was acquired to facilitate defendant's work on the novel. The book was published in the fall of 1964, becoming a best-selling novel and raising defendant's adjusted gross income in that year to $89,670.

In 1965, plaintiff and defendant moved to a cooperative apartment which they purchased for a $15,000 down payment and a $20,000 mortgage. Defendant's income for the next 3 years increased due to royalties from the book *Herzog*.

The marital separation occurred in late 1966, 5 years after plaintiff and defendant were married. Plaintiff and her son continued to live in the family apartment while defendant paid the mortgage. In 1967, Daniel Bellow began nursery school. In the same year, he began receiving medical treatment.

Plaintiff began work at the Adlai Stevenson Institute and in 1968 she became employed by the *Bulletin of Atomic Scientists*. Two years later, she attended the University of Chicago in pursuit of a master's degree in urban planning. During that time, she was not employed. In 1973, she received the degree and the next year she began working for the State of Illinois.

Plaintiff filed for divorce in September 1967, and judgment was entered in February 1968. The judgment incorporated a property settlement agreement. The agreement provided that, in lieu of alimony, plaintiff was to receive $130,000 in periodic payments.

In June 1969, plaintiff filed a section 72 petition (Ill. Rev. Stat. 1967, ch. 110, par. 72) to vacate the property settlement. The petition alleged that plaintiff was ready and willing to return property received in accord-

ance with the agreement. In December 1969, plaintiff filed an amended petition which did not contain the tender of property. At that time, approximately $30,000 and one-half interest in the marital home had not been returned. Throughout the litigation and until 1974, plaintiff received and accepted payments under the original property agreement.

In July 1974, the trial court entered an order setting aside the 1968 settlement agreement. The court found financial misrepresentations made by defendant. It based its finding upon the fact that defendant concealed from plaintiff the joint tenancy ownership of the parties' apartment and bank account. Defendant also was found to have underestimated his 1968 income in a letter written by his attorneys to plaintiff's attorneys. The trial court's judgment was affirmed by this court and remanded for a hearing to determine plaintiff's right to various property and allowances. *Bellow v. Bellow* (1976), 40 Ill. App. 3d 442, 352 N.E.2d 427.

On remand, the trial court denied defendant's motion for summary judgment and entered an order directing him to pay equitable alimony of $1500 per month as long as plaintiff was working and $2500 in the event she became unemployed. The order went on to direct defendant to pay $650 per month for child support, in addition to Daniel's medical and educational expenses. The court also held defendant in contempt of court. This court affirmed the award of temporary alimony and child support but reversed the finding of contempt. *Bellow v. Bellow* (1979), 72 Ill. App. 3d 608, 391 N.E.2d 29.

In July 1978, plaintiff filed a motion for hearing on permanent alimony, attorneys' fees, and for leave to remove Daniel Bellow to New York. Defendant filed a cross-petition for custody and for summary judgment based on plaintiff's failure to restore property received under the vacated agreement. The cross-petition was denied.

The hearing on plaintiff's petition for permanent alimony was held in July 1978. Plaintiff presented joint tax returns for 1967 and 1968, a summary of transactions involving a joint savings account for years 1963-68, the documents of title for the cooperative apartment, and an estimate of expenses for herself and Daniel. Evidence presented by both sides indicated the following adjusted gross income and net spendable income for the years 1963-68:

| Year | Adjusted Gross Income | Net Spendable Income |
|------|----------------------|---------------------|
| 1963 | $ 16,852.00 | Not available |
| 1964 | $ 89,670.00 | Not available |
| 1965 | $ 79,157.00 | $ 93,379.57 |
| 1966 | $ 90,085.00 | $ 76,020.00 |
| 1967 | $127,368.00 | $102,017.00 |
| 1968 | $ 92,086.00 | $105,303.56 |

Plaintiff testified the annual family budget prior to the 1966 separation was about $40,000. She also stated the expenses for herself and Daniel in 1967 amounted to $31,000. The basis of plaintiff's argument was that the cost of living index in 1978 for New York was 193.7 compared with the figure of 100 for 1967. It was her argument that current needs equal either $31,000 or $40,000 multiplied by the index factor. She testified her rent in New York would be $780 per month, or $9,360 per year, and expenses for Daniel would be almost $1000 per month, or $12,000 per year.

Plaintiff stated she would be able to obtain a job in New York sufficient to maintain herself. She also disclosed that she had retained more than $20,000 from the 1968 settlement agreement proceeds. These monies, she testified, were to be set aside for savings.

Plaintiff and defendant differed on the issue of defendant's assets as of 1978. In their presentation, plaintiff's counsel listed defendant's assets, totaling $992,884, as follows:

| | |
|---|---:|
| Securities | $450,000 |
| Real estate investment with Samuel Bellow | 35,000 |
| Real estate investment with Maurice Bellow | 200,000 |
| Real estate investment with Maurice Bellow (foreclosed) | 40,000 |
| Kasuba real estate investment (foreclosed) | 25,000 |
| Exchange National Bank | 120,102 |
| American National Bank | 92,782 |
| Morgan Guaranty Bank | 30,000 |
| Total | $992,884 |

Defendant testified that $265,000 of the assets listed, including two real estate investments entered into with Maurice Bellow and the Kasuba real estate investment, were uncollectible. Defendant also pointed out certain duplications made in the plaintiff's list. Specifically, plaintiff's own exhibit, a statement from the Exchange National Bank, indicates the account includes 100 shares of IBM stock valued at $25,725. Another exhibit offered by plaintiff was a list of municipal bonds held in defendant's account at the American National Bank which indicated securities held with a value of $55,000. The stock held at Exchange National Bank and the securities held at the American National Bank were included in the value of holdings at the two banks but they were also included in the general list of securities valued at $450,000.

The other duplication concerned the $50,000 demand note from Maurice Bellow. The note was included in both the $200,000 Maurice Bellow investment item and the assets held at the Exchange National Bank.

An adjusted list of defendant's assets, containing no duplications, amounts to approximately $600,000 and includes the following items:

| | |
|---|---:|
| Securities | $450,000 |
| Real estate investment with Samuel Bellow | 35,000 |
| Real estate investment with Maurice Bellow (worthless) | ----- |
| Kasuba real estate investment (worthless) | ----- |
| Exchange National Bank | 44,377 |
| American National Bank | 37,782 |
| Morgan Guaranty Bank | 30,000 |
| Total | $597,159 |

In August 1978, the trial court awarded plaintiff alimony in gross in the amount of $665,552.73. There was an allowance credit to defendant of $83,302.73 for wages earned by plaintiff since 1968 and another of $82,250 for previous payments by defendant. A judgment order was entered in the amount of $500,000 on October 11, 1978. At the same time, the court increased child-support payments to be paid by defendant to $800 per month, in addition to educational and extraordinary medical expenses.

Hearing was also held on the petition for attorneys' fees. It was determined that 981 hours had been spent on the case by plaintiff's counsel. Plaintiff's expert witness testified that in 1977 and 1978 a fair and reasonable charge in the average matrimonial case was $100 to $150 per hour. The witness went on to testify that a fair and reasonable fee for plaintiff's counsel in this case was $250 per hour. The witness' testimony was not supported by case law precedent for such an hourly rate.

Another expert witness for plaintiff testified that at the trial stage a fair and reasonable fee for this kind of case would be $125 per hour. For appellate work, the fair and reasonable fee would be $100 per hour. The trial court awarded $200,000 in attorneys' fees.

Defendant filed a motion for reconsideration of the alimony in gross, child support allowances, and attorneys' fees awarded. He also submitted a memorandum of law pointing out the possibility that the court's order could lead to a loss of defendant's Federal tax deduction for alimony payments. According to defendant, the result of the trial court's awards would be an additional tax obligation of $250,000 to him.

In March 1979, the trial court denied defendant's motion and struck from the record certain verified financial statements and the memorandum of law. The trial court expressly refused to consider tax consequences of the alimony in gross award.

The judgment of the trial court was rendered on August 18, 1978, and it found that the proceedings were governed by the Illinois Divorce Act as it existed prior to October 1, 1977. Both parties have accepted that finding and the matter has been argued in this court on the basis of the law as it

existed prior to October 1, 1977. This is contrary to section 801(b) of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 801(b)). However, since both parties have accepted the finding of the court, and due to the age of this very protracted litigation, we will consider it on that basis.

### ALIMONY IN GROSS AND CHILD SUPPORT AWARDS

Defendant contends the trial court improperly based the alimony in gross award on defendant's post-divorce financial success rather than on plaintiff's needs or standard of living during the marriage. The trial court's award amounted to $50,000 per year for 10 years. This amount exceeded by roughly $10,000 the amount plaintiff testified was spent on the entire family during the most prosperous year of the marriage.

The purpose of alimony is to furnish support to the spouse or to contribute to required partial support and it is, therefore, properly measured by the need of one spouse and the ability of the other to pay. *Byerly v. Byerly* (1936), 363 Ill. 517, 525-26, 2 N.E.2d 898, 902; *Gilmore v. Gilmore* (1975), 28 Ill. App. 3d 36, 38, 328 N.E.2d 562, 564.

■■ Alimony is appropriate only if the income from plaintiff's property is insufficient to provide for her reasonable needs and the plaintiff is unable to support herself through appropriate employment or is otherwise without sufficient income, and the defendant has the means to contribute to such needed support. (See *Frank v. Frank* (1975), 34 Ill. App. 3d 957, 342 N.E.2d 404; *Busby v. Busby* (1973), 11 Ill. App. 3d 426, 296 N.E.2d 585.) Based on the evidence, it is left to the discretion of the trial court to determine or define what needs are reasonable. The court should decide what needs are reasonable, taking into account the circumstances of the parties, such as standard of living during the marriage, duration of the marriage, and any special needs, *e.g.*, medical expenses. (See *Warren v. Warren* (1963), 40 Ill. App. 2d 286, 189 N.E.2d 401.) Likewise, the age, education, property and other resources available to each of the parties are to be considered in determining the amount of the award and its duration.

■■ The employment or employment potential of a spouse seeking alimony is only one factor in determining whether alimony should be awarded. An alimony award may also be proper where the spouse is employed but with little prospect of earning a salary commensurate with the spouse's needs, or the spouse has insufficient property to provide a sufficient income, or the spouse is unemployed and would have little opportunity to earn an adequate salary, if employed, due to old age, bad health, or lack of job skills or education. See *Jackson v. Jackson* (1975), 34 Ill. App. 3d 407, 339 N.E.2d 764.

At the time the divorce was sought, the parties had been married 7

years. They lived together as man and wife for 5 of those years. The ages of the parties at that time are not certain. It appears from the record that they were in good health. During those 5 years, the adjusted gross income of the household did not rise above approximately $16,000 until 1964, when defendant's renowned novel raised his gross income to $89,670. In 1965, Mr. Bellow began receiving royalties from the novel.

Plaintiff presented three theories upon which she based her right to an extraordinary alimony award. They were (1) an increase in the cost of living index, (2) the post-divorce success of Mr. Bellow's writings, and (3) an interpretation of this court's opinion in *Bellow v. Bellow* (1976), 40 Ill. App. 3d 442, 447, 352 N.E.2d 427, 432.

First, an increase in the cost of living, standing alone, has been repeatedly turned down as a sufficient reason to increase or augment alimony awards. The reasoning behind that principle is that inflation affects both parties rather than merely one spouse or the other. (*Nordstrom v. Nordstrom* (1976), 36 Ill. App. 3d 181, 185, 343 N.E.2d 640, 643; *Goldberg v. Goldberg* (1975), 30 Ill. App. 3d 769, 771-72, 332 N.E.2d 710, 713.) In *Goldberg*, the reasoning was explained in further detail when the court said:

> "We do not believe that inflation in itself is sufficient to establish a material change in circumstances. A material change in circumstances is not shown by merely having the court take judicial notice of inflation, but instead by evidence clearly indicating that the applicant's needs have thereby increased since the original award of alimony." 30 Ill. App. 3d 769, 772, 332 N.E.2d 710, 713.

The second and third theories raised by plaintiff are, in our view, interrelated and should be discussed together. Plaintiff argued at length that a final alimony award could be based upon defendant's post-divorce success. Additionally, the trial court stated that this court "had in mind that Mrs. Bellow was going to be able to take advantage of Mr. Bellow's post-decree success."

The trial court, in its oral opinion announcing the alimony award, stated, according to the transcript:

> "And I want to read this language into the record, although it's already there, of the opinion handed down by the reviewing Court in this Case. This is what the reviewing Court said:
>
> 'In reaching our decision, we are aware the plaintiff had the benefit of able counsel all through the proceedings.' * * * 'We are reluctant to overturn the property settlement agreement voluntarily entered into,'—and this is what I am emphasizing—'and we are aware that the effect of our judgment will be to give Susan Bellow the privilege of having both eliminated the risk of the defendant's

uncertain future, as well as taking advantage of his post-decree success.'

So obviously the Appellate Court had in mind that Mrs. Bellow was going to be able to take advantage of Mr. Bellow's post-decree success."

In 1974, the trial court entered an order setting aside the original property settlement agreement. The court found financial misrepresentation attributable to defendant. The finding was based, in part, upon the contention that defendant misrepresented his income.

The paragraph of this court's opinion from which the trial court's quote is lifted reads as follows:

"In reaching our decision we are aware the plaintiff had the benefit of able counsel all through the proceedings. We are reluctant to overturn the property settlement voluntarily entered into, and we are aware the effect of our judgment will be to give Susan Bellow the privilege of having both eliminated the risk of the defendant's uncertain future as well as taking advantage of his post-divorce success. Nevertheless, we find there is evidence to support the judgment of the trial court, and this court will not set aside the judgment and findings of the trial court unless they are against the manifest weight of the evidence. *Bilsky v. Bilsky* (1974), 18 Ill. App. 3d 329; *Murphy v. Murphy* (1975), 31 Ill. App. 3d 321." *Bellow v. Bellow* (1976), 40 Ill. App. 3d 442, 447, 352 N.E.2d 427, 432.

This court, in the 1976 appeal, was referring to the fact that, since the decree was set aside on the basis of misrepresented income, plaintiff could proceed on the basis of actual income. This brought on the realization that defendant's post-divorce success and popularity could not avoid the scrutiny of the trial court on remand and that would work to the benefit of plaintiff. Nevertheless, there was nothing said by this court which should be construed as a divergence from the well-established "special equities" rule then in effect under the Divorce Act (Ill. Rev. Stat. 1975, ch. 40, par. 1 *et seq*).

"[I]t must be alleged and proved by the spouse seeking a part or all of the property in the name of the other that he or she has furnished valuable consideration such as money or services other than those normally performed in the marriage relation which has directly or indirectly been used to acquire or enhance the value of the property." (*Everett v. Everett* (1962), 25 Ill. 2d 342, 347, 185 N.E.2d 201, 204-05.)

The manner in which the trial court determined the maintenance award in the case at bar obviously departs from that well-settled rule.

The derivation of figures representing defendant's assets is pertinent to this analysis. In closing argument at trial, plaintiff listed defendant's assets and stated to the court that they amounted to $1,228,000. The figure was accepted by the trial court, but the list of assets presented by plaintiff only amounts to $992,884. Also, uncontroverted evidence indicated $265,000 of the assets listed were worthless, while $130,725 of the assets were counted twice. The adjusted figure, $597,159, is less than half the figure represented to the trial court. We need look no further to see that an important part of the trial court's data for determining the maintenance award was inaccurate. An excessive award could logically be attributed to such inaccuracy and error.

We are also aware of plaintiff's testimony that in the best relevant year the Bellow household budget was no more than $40,000; that she had been able to put aside more than $20,000 of preliminary settlement funds; and that from employment after 1978 she could support herself.

■■ We have taken all relevant factors into consideration including the erroneous conclusions of the trial court, and we modify the alimony in gross and child support awards set by the trial court. We, accordingly, issue the following order:

Effective as of and retroactive to August 18, 1978, the defendant, Saul Bellow, shall pay unto the plaintiff, Susan Bellow, $2,000 per month as and for unallocated alimony and child support. The lump sum alimony and unallocated child support, payable in monthly installments, shall be for a maximum period of 121 months commencing from the date the first payment became due, as set forth above. The award shall be treated as alimony in gross.

The payments ordered to be made by the defendant to the plaintiff herein, being unallocated as between alimony and child support, are intended by this judgment to qualify in total as payments in discharge of defendant's legal obligation arising from the family relationship and incident to a dissolution of marriage by divorce, and that such payments would be includable in plaintiff's gross income pursuant to section 71 of the Internal Revenue Code of 1954 as amended, and deductible by defendant from his gross income pursuant to section 215 of the Internal Revenue Code of 1954 as amended. Defendant shall be given credit against the foregoing for such amounts of alimony and child support he may have paid to plaintiff since August 18, 1978, to the present time. On plaintiff's death, any payments not yet due shall abate. If the child attends private school or college and lives away from home, and defendant pays for his room and board, defendant shall be given a credit for such expenses against the monthly installment payments.

In determining the aforementioned alimony in gross award, any and all payments that the parties agreed were deductible under the terms of

the original judgment shall remain as income to the wife and deductible by the husband.

## TAX CONSIDERATION

■■ In cases such as this, involving sizable awards, it may well be desirable for the court to consider supplemental data regarding tax consequences. There is no reason to turn from the principle that consideration of tax consequences of alimony or maintenance awards is important. (See generally *Schuppe v. Schuppe* (1979), 69 Ill. App. 3d 200, 387 N.E.2d 346; *Crosby v. Crosby* (1977), 48 Ill. App. 3d 759, 363 N.E.2d 211; *Thomas v. Thomas* (1974), 18 Ill. App. 3d 673, 310 N.E.2d 432; *Jacobs v. Jacobs* (1946), 328 Ill. App. 133, 65 N.E.2d 588.) We have chosen to modify the award so that the payment of unallocated alimony and child support will be included in plaintiff's gross income and deductible by defendant, pursuant to Federal income tax laws. We believe the trial court is required to consider the tax consequences of the awards that are ordered.

## ATTORNEYS' FEES

Defendant contends the trial court's award of attorneys' fees was excessive. We find this matter to have been seriously contested at all levels. Persistence has been characteristic of both parties and their able and skilled counsel. Plaintiff argues the fact that when a person does not settle a case and proceeds to trial it should not preclude an award of fees in that person's favor, and that a refusal to settle is a matter of judgment. Along the same line of reasoning, a person who, like defendant, appeals at various stages of litigation is also exercising judgment. Such conduct should not, in and of itself, mandate the payment of fees or justify the amount of a fee award. Plaintiff's contention that defendant's conduct was uniquely litigious so as to justify the amount of the fee award is, therefore, not persuasive.

At the same time, we reject defendant's assertion that the alimony award itself provided ample funds to allow plaintiff to pay her counsel. The alimony award was based on a set of criteria exclusive of attorneys' fees and any effort to connect them is misspent. See generally *Hall v. Hall* (1976), 43 Ill. App. 3d 97, 356 N.E.2d 1156; *Green v. Green* (1976), 41 Ill. App. 3d 154, 354 N.E.2d 661.

In divorce proceedings, the award of attorneys' fees is based on a showing of the inability of one spouse to pay and the ability of the other spouse to do so. (*Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 581, 373 N.E.2d 576, 581.) The allowance of attorneys' fee is within the sound discretion of the trial court and such an award will not be reversed unless the court has clearly abused its discretion. (See *Leader v. Cullerton* (1976), 62 Ill. 2d 483, 343 N.E.2d 897.) However, we do take issue with the

amount of fees allowed. Most recently, this court, in the case of *Donnelley v. Donnelley* (1980), 80 Ill. App. 3d 597, 400 N.E.2d 56, was faced with a challenge to the amount of an award of attorney's fees. In *Donnelley*, the petition for attorney's fees sought the "fair and reasonable value" of the legal services performed for the plaintiff. In its analysis, this court pointed out the standards relating to the award of attorney's fees both applicable to the provisions of the Divorce Act, under which these proceedings are determined, and the provisions under the present Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*) and stated:

> "Attorney's fees are awarded in the sound discretion of the trial court (*Leader v. Cullerton* (1976), 62 Ill. 2d 483, 343 N.E.2d 897; *In re Custody of Scott* (1979), 75 Ill. App. 3d 710, 394 N.E.2d 779); however, a court of review will not hesitate to reduce the fees awarded if they are unreasonably high (*Leader v. Cullerton*; *Christian v. Christian* (1979), 69 Ill. App. 3d 450, 387 N.E.2d 1254.) In awarding fees, consideration is given by the Illinois courts to a variety of factors including: the skill and expertise of the attorneys employed; the financial positions of the parties; the nature of the controversy; the novelty or difficulty of the questions raised; the importance of the question from a family law viewpoint; the degree of responsibility involved from a management perspective; the time and labor involved; the usual and customary charge for the same or similar services; and the benefit or result provided. (*Christian v. Christian*; *Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 373 N.E.2d 576.) Of these the time factor is probably given the same weight or greater weight than any other factor. (*Flynn v. Kucharski* (1974), 59 Ill. 2d 61, 319 N.E.2d 1; *Welsh v. Welsh* (1976), 38 Ill. App. 3d 35, 347 N.E.2d 512.) The fee allowance should provide for fair compensation but only for those services which were both reasonable and necessary to the action. (*Gasperini v. Gasperini*; *Moreau v. Moreau* (1973), 9 Ill. App. 3d 1008, 293 N.E.2d 680.) In essence, the award of fees should provide fairness to all concerned: the attorney; the client; and the person who will make the payment. *Gasperini v. Gasperini*; *Green v. Green* (1976), 41 Ill. App. 3d 154, 354 N.E.2d 661." *Donnelley*, 80 Ill. App. 3d 597, 602, 400 N.E.2d 56, 59-60.

After careful review of the lengthy record in this case, and in light of the principles set forth above, we find it necessary to reduce substantially the trial court's award of attorneys' fees. As in *Donnelley*, petitions were filed during the course of this case, seeking payment of "reasonable attorneys' fees" for plaintiff. It was determined by stipulation that 981 hours had been expended on the case by plaintiff's counsel. Plaintiff

offered the testimony of two expert witnesses, Joseph DuCanto, Esq., and William Harte, Esq., to substantiate her position on the value of legal services rendered to her by her attorneys.

Mr. DuCanto holds an extensive academic and practical background in the field of matrimonial law. A seven-page hypothetical question was submitted to him in which he was told of the various results obtained by counsel on behalf of plaintiff during the course of litigation. He was also made aware of the hours of work expended. Mr. DuCanto testified that, in his opinion, a fair and reasonable fee for the services rendered plaintiff was in the range of $225,000 to $250,000. To support his opinion, he said:

> "It is based upon all of the elements that I have seen in connection with this matter via the stipulation and the information you have given me this morning.
>
> It involves the uniqueness of the case itself, the nature of the controversy, the amount involved, the standing of counsel and the expertise of counsel in connection with the matter, the character and nature of the parties in the litigation itself, the time expended, the results achieved, and the certainty and uncertainty of compensation to be received by counsel for the prevailing party."

Mr. Harte was also called to testify on the issue of attorneys' fees. He holds an extensive background in trial and appellate practice. Mr. Harte was testifying as an expert witness for the first time in his career. The same detailed hypothetical question presented to Mr. DuCanto was presented to him. He testified that a fair and reasonable fee at the trial level, payable to counsel for plaintiff, was $125 per hour. It was his opinion that, with respect to the time expended on appeal, a fair and reasonable fee would be $100 per hour. To support his opinion, Mr. Harte emphasized the high professional quality and expertise of opposing counsel, coupled with consideration of the nature of the controversy, the significance and importance of the issues, and the subject matter.

Mr. Harte recommended the court apply a multiplier of 2 to the basic charges. He explained the multiplier thusly:

> "Then after that computation, which would be a purely mechanical computation of time as against the charge by the hour, there should be a payment made for other criteria within fee awards such as the—in consideration of the nature of the controversy, the significance and importance of the issue, and subject matter, the responsibility involved, the skill of the people involved, which goes into the original general hourly award.
>
> Also a consideration should be the ability and competency of the counsel on the other side of the question, and in this regard I have been given the appellate briefs in this matter and been made aware of the attorneys, Bruce Schimberg and Henry Mason are extremely

competent attorneys, George Feiwell and Michael Braun are extremély competent attorneys * * *. I know these men well and their reputations in the community are excellent and they are very aggressive litigants. Barry Freeman is an extremely competent lawyer and attorney.

So that consideration also should go into a multiple of the reasonable per diem charge which, in this case, considering the uniqueness of the question, the fact that there was a fait accompli of the decree which had to be overturned on the basis of alleged fraud, and the continuing litigation thereafter, both in the trial court and the appellate court, deserve a multiple of 2, I would say.

So that their per diem charge or the reasonable per diem charge should be doubled under the circumstances in this case.

    * * *

Also within this multiple of 2, I should include the fact that there is stated in the supplemental petition for fees the fact that Susan Bellow had limited funds with which to pay attorney fees and court costs, has little if any funds left to pay fees, and that Saul Bellow is a man of great wealth and income and is well able to pay attorney fees.

That is what I have assumed also. That would mean that the attorneys who undertook this litigation, and notwithstanding the fact that they were paid fees initially, would have to look ultimately, realistically, to the success of the litigation in presenting their petitions and seeking to obtain attorney fees from Mr. Bellow which would only be realistically paid in the event they were successful in their endeavors.

And this contingent factor is also, and must be—it must be considered also.

That is my opinion."

We believe it was this testimony the trial court relied upon most heavily in reaching its conclusion on attorneys' fees. Mr. Harte suggested that the basic hourly rate, under the circumstances, be doubled due to many factors. In that area, we are not persuaded by the expert testimony.

First, we are aware of no authority that supports the use of a multiplier in matrimonial fee award cases. On cross-examination, Mr. Harte was specifically asked whether he knew of any case where the multiplier concept had been used. His response made reference to this court's opinion in *Welsh v. Welsh* (1976), 38 Ill. App. 3d 35, 347 N.E.2d 512, in order to make the point that there must be some consideration for the various criteria that increase the attorneys' fees over the hourly rate.

Our reading of *Welsh* does not lead us toward a rationale that supports the multiplier concept in a matrimonial case. Rather, we ratify

the analysis of the court in *Welsh* to support a modification and reduction of the fee award in this case. The court said:

"It is our considered opinion that the attorney's fees allowed by the court in this case are higher than they should reasonably have been. The subject matter of the case did involve matters of significance or importance as does virtually every case, particularly from the point of view of the litigants. In addition, in this case, as in every piece of litigation, the lawyers bear a high degree of responsibility. In our opinion, the standing in the legal profession and the skill of counsel before us in this case are of the highest order. However, the time and labor necessarily involved in representing the plaintiff in the case before us does not reasonably justify the fees granted. * * *

If these facts, apparent from the proceedings themselves, were the only matters before us, the fee allowed by the court would appear excessive. We also have before us the testimony of a highly qualified expert and the narrative testimony of counsel for plaintiff. In our opinion, an important element is lacking in both of these sources. From neither one can we obtain more definite information as to the time spent which is material in determining the reasonable amount of the fee. Time spent upon the case is necessarily an important element. We are not dealing here with a situation in which the amount of a fund can be used as a helpful guideline in fixing the amount of fees. (Compare *Leader v. Cullerton* (1974), 25 Ill. App. 3d 216, 323 N.E.2d 11, as modified by *Leader v. Cullerton* (1975), 62 Ill. 2d 483, 343 N.E.2d 897.) It may not be said that the time expended by the attorney is the only essential element in this instance but it must be conceded that the time expended is at least as important as any other factor in determining the amount of fees." *Welsh*, 38 Ill. App. 3d 35, 40-41, 347 N.E.2d 512, 516.

Second, there has been an effort by this court to grapple with the problem of determining appropriate attorneys' fees in marital dissolution cases (see, *e.g.*, *Donnelley v. Donnelley* (1980), 80 Ill. App. 3d 597, 400 N.E.2d 56; *Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 373 N.E.2d 576, discussed and cited above). As a result, we have drawn certain criteria for deciding those cases. To interject the use of a multiplier, even in the most extraordinary instances, would bring us full circle in our efforts. We would then be faced with the problem of establishing certain criteria for the justification of a given multiplier. It is foreseeable, were plaintiff's concept adopted, that we would one day have to decide whether a multiplier of 3, 4, or 5 was appropriate. That is clearly an undesirable spectre.

Further, the application of a multiplier in matrimonial cases would

only serve to add to the existent apprehensions of the public regarding the way in which attorneys' fees are derived. It is incumbent upon the courts to keep the justification for costs and charges as clear and accurate as possible.

■■ We wish to leave no doubt that the issues presented in this case did involve complex matters of great significance, first and foremost, to the family of the parties. As well, the lawyers on both sides bore a great degree of responsibility and embodied the best of skills and professionalism. Nonetheless, it has been the long-standing rule in this State that courts will not be bound by the opinion of attorneys as to what constitutes reasonable attorneys' fees. The courts may also use the knowledge they have acquired in the discharge of professional duties to value legal services rendered. *Richheimer v. Richheimer* (1965), 59 Ill. App. 2d 354, 365, 208 N.E.2d 346, 352.

■■ We hereby modify and reduce the award of attorneys' fees to $125,000. The defendant shall be given credit against this award for any amounts of attorneys' fees, court costs, and· expenses paid by him to plaintiff's present or former attorneys during the course of these proceedings, beginning with the institution of the initial divorce proceedings and to the continuation of said proceedings to finality herein, including fees, costs, and expenses incident to all appeals herein.

Finally, in connection with the issue concerning restoration of funds received by plaintiff under the vacated property settlement agreement of 1968, we find we need not consider the issue because we have taken that into consideration in arriving at the alimony in gross award.

We, therefore, reduce alimony in gross and unallocated child support to an unallocated amount of $2000 per month for a maximum 121 months, less credits, as detailed in the body of this opinion. The amount so awarded shall be treated as alimony in gross—a lump sum payable in installments; the amount received by plaintiff shall be taxable to her and the amount paid by defendant shall be tax deductible to him. We reduce the award of attorneys' fees from $200,000 to $125,000, less credits, as set forth in the body of this opinion.

For the foregoing reasons, the judgment order of the circuit court entered of record on October 10, 1978, is affirmed as modified.

Affirmed as modified.

ROMITI, P. J., and JIGANTI, J., concur.