*In re* MARRIAGE OF JÁNE A. THEEKE, Petitioner-Appellee, and JON A. THEEKE, Respondent-Appellant.

First District (2nd Division)    Nos. 80-398, 80-2647 cons.

Opinion filed December 22, 1981.—Modified on denial of rehearing April 13, 1982.

STAMOS, P. J., concurring in part and dissenting in part.

Paul R. Jenen, of Wheeling, for appellant.

Scott & Fulkerson, of Chicago (Alan L. Fulkerson, of counsel), for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

After 16 years of marriage, Jon and Jane Theeke (hereinafter "Jon" and "Jane" for ease in identification) obtained a divorce in October 1979. Jane was awarded custody of their three children, Jonny, age 14, and

twins, Jennifer and Janiece, ages 9. Jane was also awarded exclusive possession of the marital home for a period of 10 years and 60% of the net proceeds from the sale of the home. The other significant marital asset, Jon's profit-sharing plan, was divided equally between the parties. Jon appeals the award of child custody, the division of marital property and the award of attorney fees.

The issues with which we are presented are whether: (1) the trial court committed error in making certain evidentiary rulings; (2) the award of child custody to Jane was against the manifest weight of the evidence; (3) the division of marital property and child support was against the manifest weight of the evidence; and (4) Jon was improperly ordered to contribute to Jane's attorney fees.

During the trial on the issue of child custody, Janiece and Jennifer testified, *in camera*, that they preferred to live with their mother. They believed that Jon and Jane both loved them; both parents helped them with their homework and attended Parent Teacher Night; Jane did the cooking, laundry, shopping and house cleaning, although sometimes Jon cooked; and when something bothered them, they usually talked it over with their mother. Jon spoke to them about custody on several occasions. Once he told them, "If you live with your mom, I may have another family and I may not want you anymore." They got along with their brother, Jonny, and desired to continue living with him.

Jonny also testified *in camera*. He believed both parents loved him. He preferred to live with his father. He got along with his sisters except for an occasional fight. He loved his sisters and wanted to continue living with them. He did not know whether it would be hard for his sisters to live with his father.

At trial, Dr. Monte J. Meldman, a certified psychiatrist and the author of four books, testified on Jane's behalf. He interviewed her in August 1978, and subsequently had her perform a psychological test known as the Minnesota Multi-Phasing Inventory. The test indicated that Jane had no abnormal psychological problems and had a good ability to manage things.

James Hess testified that he was principal of Central School, and that he had known the Theekes for about five years. Both parents were actively involved in a number of school activities.

Betty Hauer testified that she was employed as a case worker by Cook County. Her duties required her to visit the home, interview the parents and make recommendations as to child custody based on her observations. She considers a number of factors in determining which parent is best able to serve the interests of the children, including the manner in which the parent handles the divorce-custody matter with the children. Based on her interviews with the Theeke family and their neigh-

bors, she concluded though both Theekes were loving parents, Jane was better qualified for running the household and taking care of the children's everyday needs.

Jane testified that she believed she was fit to have custody of the children because she had always been responsible for their care. Jon was incapable of adequately taking care of the children because of the demanding nature of his job.

Raymond Russo, coach of Jonny's baseball team, testified in Jon's behalf. He knew the Theekes through their involvement in Little League Baseball. Jane attended about 10% of Jonny's baseball games and practices until 1979 when the girls began playing on a team. The paternal grandparents, Leona and Patrick Theeke testified that if their son was awarded custody of his children, they would immediately retire and move so that they could help take care of the children. Leona acknowledged that Jane was a loving mother and would be a fine custodial parent.

Jon testified that he loved his children and believed that he was more capable of bringing up the children than Jane. He had not treated his girls any differently than he treated Jonny.

At the conclusion of the trial, the court found that both parents were fit to have custody of the children, but that it was in the best interests of the three children for custody to be awarded exclusively to their mother.

The following evidence was heard at trial on marital property distribution. Jon averred that his monthly expenses added up to a total of $1,140. His sole indebtedness amounted to $5,539. His gross earnings were $26,225 in 1978 and $29,050 in 1979. Jane testified that she obtained her real estate broker's license in 1973. In 1974, she made between $9,000 and $10,000. In 1975 she earned between $13,000 and $14,000 and in 1976 she made between $16,000 and $18,000. The money she earned she spent to help support the family. She and the three children have current monthly expenses of approximately $2,000. Her business related debts total $5,923. On the final day of the trial Jane was employed by Safeguard Business Systems and was receiving a loan of $1,900 per month which was to continue for a six month period of time. In the event that she was terminated prior to the end of the six-month period, the total loan amount received during that period of time would be forgiven. If her employment extended past six months, she was to repay the salary advanced her. The only marital assets of significant value were the family's home, having a net worth of $70,250 and Jon's Sears Roebuck Profit & Savings Plan, having a value of $11,300.

The court awarded Jane and the three children the exclusive right to use and possess the marital home for a period not to exceed 10 years at which time the twins would have reached the age of majority. The net proceeds derived from the sale of the home in the future was to be

divided, with 60% to go to Jane and 40% to Jon. Jon was ordered to pay child support equal to 35% of his net take-home pay, but not less than $602 per month. The pension profit-sharing plan was split equally between Jon and Jane, each being awarded $5,600. Jon was given visitation rights every other weekend from Saturday morning until Sunday evening.

Neil Robin, Jane's initial attorney, testified that he had expended 90 court hours and 65 office hours in handling this matter. A substantial amount of his time resulted from Jon's repeated failure to comply with court orders. The court awarded him a fee of $12,688, representing $90 per hour for court time and $65 per hour for office time, of which Jon was ordered to pay $7,688. The court also ordered Jon to pay Jane's attorney fees of $2,378 for the defense of the appeal.

# I

■■ Jon argues first that the trial court erred in its refusal to allow Jonny to testify in open court in order to rebut Jane's testimony that Jon could not adequately supervise the children while working at his present job, and Hauer's testimony that Jane was better equipped for custody of the children, relying on *Crownover v. Crownover* (1975), 33 Ill. App. 3d 327, 337 N.E.2d 56. *Crownover*, however, affirmed the case law holding that a child's testimony may be taken by the court either from the witness stand, or in chambers, in the court's discretion. (33 Ill. App. 3d 327, 329; see also Ill. Rev. Stat. 1979, ch. 40, par. 604(a).) In addition, *Crownover* held that there is no absolute right to present the testimony of a child in a custody proceeding. (33 Ill. App. 3d 327, 330.) In the instant case the court in its discretion decided to elicit Jonny's testimony during an *in camera* interview rather than on the stand, observing "how much should * * * [Jonny] be subjected to by way of an adversary court proceeding between two parents he dearly loves." The *in camera* proceedings were taken by a court reporter and a transcript was made part of the record. We have examined the testimony given by all three children, in the presence of court and counsel, and find that the rebuttal testimony sought by Jon was already substantially elicited on direct examination and would have been repetitious. Under these circumstances, it was well within the court's discretion to determine that Jonny should not be subject to such a proceeding. See also *Frees v. Frees* (1968), 99 Ill. App. 2d 213, 240 N.E.2d 274.

Jon contends further that the trial court improperly heard evidence outside the record on the question of child custody. On February 7, 1980, during a hearing on a post-trial motion, the court stated that it would not reverse its position on the child custody issue, because, in part, Bobette Levy of the Court Consultation Service had recommended that custody be given to Jane. Jon concedes that there is nothing in the record to

indicate that the conversation with Levy occurred prior to its decision concerning child custody on December 10, 1979. Since a trial court is presumed not to have considered improper evidence in reaching a decision, Jon argues that the conversation with Levy was reversible error even if it occurred after the trial court's initial custody ruling, citing *Williams v. Williams* (1955), 8 Ill. App. 2d 1, 7, 130 N.E.2d 291. In *Williams*, the trial court had requested the Cook County Bureau of Public Welfare to make a confidential investigation of the respective homes of the parties, the results of which were not made available to counsel for either party. Unlike the circumstances in the instant case, however, the court there considered the resulting reports in making its final decision. 8 Ill. App. 2d 1, 3, 7.

■■ Furthermore, in *Dayan v. Dayan* (1967), 86 Ill. App. 2d 358, 360, 361, 229 N.E.2d 568, the appellate court held that although a number of cases have held that it is "improper for a judge * * * to base a decision on reports or evidence that are not * * * in the record," citing *Williams*, consideration of an incompetent report is not reversible error where "the evidence amply supports the award of custody of the three younger children to the mother." Similarly, in *Katzer v. Katzer* (1978), 61 Ill. App. 3d 299, 309, 378 N.E.2d 316, the court held that admission of a confidential report prepared by Cook County Department of Supportive Services constituted harmless error in light of the other evidence which supported the custodial award entered by the trial court. In this case, as in *Dayan* and *Katzer*, there is overwhelming evidence to support the award of the children to the mother with or without the opinion of Levy, which, at all events, appears to have been heard after the decision was rendered.[1]

■■ Jon next contends that the trial court improperly elicited the recommendation of the attorney for the children, Robert Wilcher, as to custody; that Wilcher's role in the trial was that of an advocate rather than that of a guardian ad litem; and that he had no power to make a recommendation with respect to the question of child custody. His obligation was to represent the interests of the children with respect to support, custody and visitation. (Ill. Rev. Stat. 1979, ch. 40, par. 506.) The only "recommendations" shown by the record to have actually been advanced, however, were asserted during his closing argument. At that time the trial court permitted counsel for each party to make a "recommendation" on the child custody issue. In addition, Wilcher's closing argument was based solely on the evidence presented during the trial and properly focused the court's attention on the children's best interests.

■■ It is argued next that the trial court erred in refusing to hear evidence

---

[1] During a colloquy between court and Jon's counsel on the post-trial motion, the latter stated, in part, "* * * I am not saying this Court improperly talked to Bobette Levy until subsequent to this Court's final decision."

of the financial circumstances of the parties prior to ruling on the issue of child custody. Jon maintains that he was wrongfully denied the opportunity to demonstrate that Jane was a spendthrift. Section 602(a) of the Illinois Marriage and Dissolution of Marriage Act (hereinafter Act) (Ill. Rev. Stat. 1979, ch. 40, par. 602(a)) prescribes the award of custody after taking into consideration "all relevant factors," and a list of six factors to be examined. Relative financial circumstances of the parties is not included on that list. Respondent cites no cases which hold that prior to the award of custody, the financial situations of the parents must be considered by the trial court as a matter of law. *Lucado v. Lucado* (1954), 1 Ill. App. 2d 548, 118 N.E.2d 40, cited by Jon, is of no support or application to the proposed rule. It was well within the discretion of the trial court not to hear the evidence related to financial circumstances at that time.

■■ Jon next claims that the trial court abused its discretion in awarding child custody to Jane. All the children indicated that they loved their mother. Both Jennifer and Janiece expressed a preference to live with her. Jon's mother testified that, in her opinion, Jane was a good and loving mother. Hauer, the case worker, testified that Jon had discussed custody with the children on many occasions in violation of a court order enjoining such communications. Jon informed her that he did not regard housekeeping, laundry or dishwashing responsibilities as part of his role. Hauer concluded on the basis of her interviews with the Theekes and their neighbors that it would be in the best interests of the children for custody to be awarded to Jane. There is strong evidence in the record that Jon loved his children and would have been a fit parent; however, on balance, the trial court held that it would be best for custody to be granted to Jane. The trial court's determination was abundantly supported by the record.

## II

Jon urges next that the trial court abused its discretion under section 503(c) of the Act (Ill. Rev. Stat. 1979, ch. 40, par. 503(c)) by distributing insufficient marital property to himself. He maintains that he was the chief financial contributor to the marital assets of the parties, yet Jane is to receive 60% of the proceeds from the sale of the marital home. Jane responds that the division of property was fair because she made substantial contributions to the family during the 16-year marriage. She raised three children, maintained the marital home, prepared meals and later contributed financially.

■■ The fact that Jon contributed more financially than Jane does not necessarily entitle him to a greater distribution of the marital property. (*In re Marriage of Stralow* (1981), 95 Ill. App. 3d 235, 419 N.E.2d 1227.) To be considered in this regard is the court order requiring Jane to pay all mortgage payments, real estate taxes, insurance, maintenance and upkeep

for the period of time she occupies the home, thereby increasing the equity of both parties in this marital asset and safeguarding its potential as an appreciating asset. (*In re Marriage of Rizzo* (1981), 95 Ill. App. 3d 636, 420 N.E.2d 555.) The court order awarding Jane 60% of the net proceeds from the sale of the marital home, and 50% of Jon's profit and savings plan also was a proper exercise of judicial discretion in light of the disparate future earning capacity of the respective parties. Jane's net monthly pay at her provisional job was approximately $1,310 in contrast with Jon's net pay of $1,720. The Act requires an equitable distribution of marital property, not mathematical precision. (*In re Marriage of Stallings* (1979), 75 Ill. App. 3d 96, 393 N.E.2d 1065.) In addition, Jane's future net earning capacity is more uncertain than Jon's because her employment had a probationary period of six months.

■■ Complaint is made concerning the trial court's failure to consider Jon's own attorney fees as a factor in considering the relative financial positions of the parties; however, since Jon failed to present evidence of the amount of attorney fees he incurred, he cannot now raise the issue on appeal for the first time (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147, 324 N.E.2d 417), and has effectively waived his right to appeal this issue by not presenting such evidence at the trial level.

### III

■■ The argument next presented is that the award of child support equal to 35% of Jon's net income was an abuse of discretion. He argues that with the $602 per month child support check, Jane's monthly disposable net income exceeds her expenses by $454, whereas Jon's net income will be $22 short of his total expenses. This argument is based upon the false premise that no State or Federal taxes will be taken out of Jane's gross paycheck. If taxes are included in the analyses, Jane's monthly income including child support falls $135 short of her monthly expenses. The trial court did not abuse its discretion in ordering that Jon pay 35% of his net income for child support.

■■ Claiming that possession of the marital home by Jane should have been considered as additional child support, Jon cites *Lamp v. Lamp* (1979), 73 Ill. App. 3d 713, 392 N.E.2d 349, *aff'd* (1980), 81 Ill. 2d 364, 410 N.E.2d 31, and *Barlow v. Barlow* (1978), 56 Ill. App. 3d 629, 372 N.E.2d 422, and asserts that the amount of child support should have been reduced proportionately. In neither *Lamp* nor *Barlow*, however, did the spouse awarded possession become exclusively obligated to pay mortgage installments, real estate taxes, insurance, maintenance and upkeep, as in the case *sub judice*. We find no error in the treatment of this issue by the trial court.

## IV

■■ Error is identified by Jon in the trial court's award of attorney fees allegedly because of Jon's vexatious behavior. Jon cites *In re Marriage of Miller* (1980), 84 Ill. App. 3d 931, 938, 405 N.E.2d 1099, holding "the sole criterion for assessing fees is the relative financial resources of the parties" and concludes that vexation and harassment are not relevant considerations in assessing fees under section 508 of the Act. Examination of the instant record in this respect, however, finds no support for this contention. The trial court merely alluded to the fact that it did not overlook the unnecessarily drawn-out procedure which took place, without assigning any responsibility for it to either party. The trial court here considered evidence relative to the financial circumstances of the parties, their respective employment compensation, debts, expenses and household necessaries and found that the burden of costs should not fall upon Jane, which would exhaust her resources, but should be shared by Jon in requiring him to pay a part of her attorney fees. In doing so, it properly noted that inability to pay does not require financial destitution. (*Donnelley v. Donnelley* (1980), 80 Ill. App. 3d 597, 600, 400 N.E.2d 56; *Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 582, 373 N.E.2d 576.) Jane's earlier part-time employment and probationary employment at the time of hearing does not provide a sufficient basis upon which to find equality in earning power with that of her husband, a college graduate employed by the same company since 1967 with steady increases in compensation. In view of all the evidence, we cannot say that this award was an abuse of discretion. *Robinson v. Robinson* (1981), 100 Ill. App. 3d 437, 450, 429 N.E.2d 183; *In re Marriage of Rizzo* (1981), 95 Ill. App. 3d 636, 651, 420 N.E.2d 555.

■■ It is also contended by Jon that the award of attorney fees to Jane was excessive. Neil Robin, one of her attorneys, sought $75 per hour for office time and $150 per hour for court time in accordance with his retainer agreement. The trial court reduced the attorney fees to be awarded to $90 per court hour and $65 per office hour, in explicit recognition of the financial resources of the parties. In view of this reduction, the order was not excessive, particularly when Robin's considerable experience on domestic relations matters is contemplated. Also to be noted is the continuing series of challenges of almost every issue raised in this case. Although the issues were not complex, it may be said that they were fervently disputed at every turn. (*Cf. Christian v. Christian* (1979), 69 Ill. App. 3d 450, 459-60, 387 N.E.2d 1254; *Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 373 N.E.2d 576; *Schwartz v. Schwartz* (1976), 38 Ill. App. 3d 959, 966, 349 N.E.2d 567.) Furthermore, the hourly rate awarded compares favorably with the customary charges made in the

community for such services. See *Bellow v. Bellow* (1981), 94 Ill. App. 3d 361, 419 N.E.2d 924.

■■■ Jon maintains that the trial court erred in awarding attorney fees for the defense of Jane's appeals, asserting that it was without authority to grant attorney fees for the defense of an appeal once a notice of appeal has been filed. It appears that a portion of the fees awarded were for services related to the defense of an appeal which had been dismissed, docket No. 80-573, and a portion to the pending appeal, docket Nos. 80-398 and 80-2647, consolidated. An award of attorney fees for services already rendered in defense of an appeal is permitted by law. (Ill. Rev. Stat. 1979, ch. 40, par. 508(a)(3); *In re Sharp* (1978), 65 Ill. App. 3d 945, 950, 382 N.E.2d 1279.) As to attorney fees awarded for prospective services to be rendered in defense of a pending appeal, it has been held recently in *In re Marriage of McBride* (1981), 102 Ill. App. 3d 84, 87-88, 429 N.E.2d 867, *In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 466, 426 N.E.2d 1087, and *In re Marriage of Giammerino* (1981), 94 Ill. App. 3d 1058, 1061, 419 N.E.2d 598, that a trial court possesses jurisdiction to consider this issue after notice of appeal has been filed and while the appeal is pending as collateral and supplemental to the appeal and may be allowed where a basis therefor has been established in the record. Although we have held otherwise in *In re Marriage of Wright* (1980), 92 Ill. App. 3d 708, 712-14, 415 N.E.2d 1196 (judgment vacated by the Illinois Supreme Court on March 29, 1982, for mootness), where we said that a trial court lacks authority to make such an award after appellate jurisdiction has attached, we depart from that position in light of more recent case authorities cited above and find that as to fees for prospective services rendered, the order of the trial court must be affirmed.

Affirmed.

STAMOS and PERLIN, JJ., concur.

STAMOS, P. J., concurring in part and dissenting in part:

I concur in the majority's disposition of the appeal; however, I respectfully dissent from that part of the modified opinion regarding the awarding of attorney fees for prospective services to be rendered in the defense of the appeal. My reasons are reflected in the opinion I authored in *In re Marriage of Wright* (1980), 92 Ill. App. 3d 708, 712-14, 415 N.E.2d 1196 (judgment vacated by the Illinois Supreme Court for mootness).