MINERAL RESOURCES, INC., *et al.*, Plaintiffs-Appellants, *v.* CLASSIC COAL CORPORATION *et al.*, Defendants-Appellees.

Fifth District   No. 82—335

Opinion filed May 9, 1983.

William G. Guerri, Michael D. O'Keefe, and Kenton E. Knickmeyer, all of Thompson and Mitchell, of East St. Louis, for appellants.

James B. Bleyer, of Marion, and Thomas E. Wack, of Armstrong, Teasdale, Kramer and Vaughan, of St. Louis, Missouri, for appellees.

JUSTICE KARNS delivered the opinion of the court:

This appeal arises from an action for damages based on breach of contract and tortious interference with contractual relations. Plaintiffs appeal from the judgment of the circuit court of Williamson County granting defendants' motion to dismiss the first amended complaint and plaintiff's cause of action and alternative motion for judgment on the pleadings. The trial court entered judgment in favor of defendants and against plaintiffs on all counts of the first amended complaint.

Plaintiffs' first amended complaint alleges that in January 1977 defendant Adams Resources and Energy, Inc. (Adams), agreed in principle with Buddie Morris to form a joint venture, Morris Coal Company, now known as defendant, Classic Coal Company (Classic), for the purpose of developing and operating an underground mine in Williamson County, Illinois. The complaint further alleges that Adams then wrote to plaintiff, Mineral Resources, Inc. (Mineral), requesting Mineral to secure long-term coal supply contracts between the joint venture and third parties. This request was addressed to plaintiff, Hugh B. Lee, Jr., in his capacity as president of Mineral and was dated February 15, 1977. This writing set forth Adams' agreement to provide a commission of 3% of the selling price of coal sold under a long-term supply contract secured through the efforts of Minerals.

The February 15, 1977, letter stated, in pertinent part, that:

"*** We agree and will likewise cause the producing company to agree to the following with respect to Mineral Resources sales agency:

(1) Mineral Resources shall receive a commission of 3% of selling price of coal sold under the long-term contract, F.O.B. trucks at the mine.

(2) Mineral Resources shall receive 3% of the F.O.B. trucks selling price for any long-term contracts ***.

(3) The commissions will be paid monthly to Mineral Resources within five days of receipt of remittance from the cus-

tomers.

(4) Mineral Resources will be responsible for administering the contract and other sales on which it receives commission, at its expense.

(5) Mineral Resources will exert its best effort to achieve highest obtainable sales prices consistent with market competition, coal quality and preparation and the desire to optimize production level and maximize profits.

(7) Adams will cause the producing company to fully support Mineral Resources' marketing efforts on its behalf and faithfully perform its producer responsibilities."

The complaint further alleged that Mineral, acting through Lee and plaintiff, C. Harry Foster, successfully negotiated two separate long-term coal supply agreements between Classic and the Tennessee Valley Authority (TVA) known as the "T-12" and "T-14" contracts. Under the terms of the two contracts, TVA agreed to purchase 4,060,000 tons and 4,202,600 tons of coal during the duration of the respective contracts.

After the supply contracts had been negotiated by Mineral and were executed by Classic and TVA, Classic signed and Mineral, Lee and Foster countersigned a letter from Classic entitled "Letter Agreement Concerning Fees." this eight-page letter set forth the various rights and obligations between Classic and Mineral, Lee and Foster regarding the payment of certain fees. The provisions of the letter agreement are extensive, but the most relevant portions are the following:

"1. Agency. *** [Classic] agrees that it will not alter its contractual arrangements with T.V.A. for other than sound business reasons and shall not alter such arrangements for the sole or main purpose of reducing the amounts to be paid to the interested Parties hereunder. Except as provided in Paragraph 1, [Classic] shall retain complete flexibility in dealing with T.V.A. and all other parties concerning the Subject Coal Contracts.

2. Consummation Fee. [Classic] hereby agrees to pay to the Interested Parties [plaintiffs], in the manner provided herein and subject to the other provisions hereof, in consideration for the Interested Parties' assistance in consummating the Subject Coal Contracts an amount equal to 75% of 3% of the gross sales price for FOB the mine involved after adjustments to the price required by the respective contracts for all coal actually paid for by T.V.A. under either of the Subject Coal Contracts. The fee described in this Paragraph 1 shall be referred to

herein as the 'Consummation Fee.'

\* \* \*

4. Duration of Consummation Fee Payments. [Classic] agrees to make payments of the Consummation Fee in the manner provided herein so long as payments for coal delivered are made to [Classic], its successors and assigns pursuant to the Subject Coal Contracts; provided, however, the parties recognize that it is not unusual for agreements like the Subject Coal Contracts to be amended or altered in connection with other arrangements to be made with T.V.A. and, in this regard, if [Classic] (i) alters its contractual arrangements with T.V.A. in such a way as to terminate the Subject Coal Contracts or reduce quantities of coal to be delivered to T.V.A. under the Subject Coal Contracts, and (ii) makes contractual or other arrangements with T.V.A. which cover the quantities of coal originally covered by the [Classic] No. 5 Contract and [Classic] No. 6 contract, [Classic] will continue to pay the Consummation Fee with respect to the altered arrangements of such quantities of coal originally covered by such contracts. In the event that deliveries of coal are not made under the Subject Coal Contracts or T.V.A. does not make payments under the Subject Coal Contracts, the obligation to pay the Consummation Fee shall arise only upon receipt of, and shall apply only to, the amounts paid by T.V.A.

\* \* \*

6. Operations. The parties to this Letter acknowledge that the Interested Parties have performed services in consideration for the receipt of the Consummation fee payments and [Classic] recognizes its good faith obligation hereunder to pay such Consummation Fee after receipt of payments by T.V.A. under the Subject Coal Contracts. Except as provided in Paragraph 1, nothing in this Letter shall ever be construed to limit in any way the methods of operation in the coal mining business to be employed by [Classic]. Nor shall this Letter be construed to limit [Classic] in any way from dealing with T.V.A. and other parties concerning the Subject Coal Contracts and performance thereunder. [Classic] shall have complete flexibilities in conducting its business and shall perform its obligations pursuant to this Letter."

Plaintiffs alleged that Classic delivered coal to TVA pursuant to the two supply contracts until 1981. During this period, plaintiffs regularly received their commissions of 3% of the selling price of the coal

delivered to TVA. In June 1981, Classic announced that because of its substantial economic losses incurred in these mine operations, it had decided to cease its production of coal and was no longer in a position to supply coal under the T-12 and T-14 contracts. Classic also ceased making commission payments to plaintiff at this time.

After several months of nondeliveries, TVA notified Classic that TVA would not accept any further deliveries of coal under the supply contracts. Plaintiffs demanded payment of the commissions in respect to coal contracted for but undelivered and certain coal that had been delivered to TVA but as to which plaintiffs had not received commission payments. Adams also refused either to make such payments or cause Classic to make the payments.

Plaintiffs filed suit against Adams and Classic in the circuit court of Williamson County. In their four-count complaint, plaintiffs demanded from defendants the sum of $6,698,206.77, an amount which plaintiffs maintain represents the total fees plaintiffs would have received had Classic delivered coal over the balance of the two TVA contracts. TVA was not a party to this action.

Defendants responded by filing a motion for judgment on the pleadings or, in the alternative, a motion to dismiss for failure to state a claim upon which relief could be granted. The trial court granted defendants' motions and entered judgment in favor of defendants from which plaintiffs now appeal.

The question to be resolved on appeal is whether the trial court properly dismissed plaintiffs' cause of action. It is well settled that a cause of action should not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved which will entitle plaintiffs to recover. (*Johnston v. City of Bloomington* (1979), 77 Ill. 2d 108, 395 N.E.2d 549.) Exhibits attached to the complaint become part of the pleadings and facts stated in such exhibits are considered the same as having been alleged in the complaint. *Ford v. University of Illinois Board of Trustees* (1977), 55 Ill. App. 3d 744, 371 N.E.2d 173.

In order to determine the sufficiency of plaintiffs' complaint, it is necessary to examine the allegations of the several counts. This examination should be conducted within the framework of what we perceive to be the basic issues: whether Classic is liable to plaintiffs for the payment of fees on undelivered coal contracted for under the TVA contract, whether Adams is liable for Classic's failure to perform under the TVA contracts and its refusal to continue paying commissions and whether the complaint states a claim for tortious interference with contractual relations.

The first issue which we will address concerns Classic's obligation to pay Mineral commissions in accordance with the March 2, 1978, letter agreement concerning fees. In count II, which is directed solely against defendant Classic, plaintiffs assert the right under the terms of the letter agreement concerning fees to "3% of the gross sales price F.O.B. mine of all coal sold pursuant to the contracts." Plaintiffs allege that Classic breached the T-12 and T-14 long-term supply contracts with TVA and ceased paying commissions. Plaintiffs further allege that Classic is liable to them for the payment of fees on all undelivered coal tonnage Classic agreed to deliver to TVA.

The thrust of defendant Classic's argument is that it is not obligated to pay plaintiffs any commissions under the letter agreement concerning fees for coal which has not yet been delivered or paid for by TVA. In support of this position, defendant contends that the letter agreement concerning fees is a divisible or severable contract which imposes a duty to pay commissions to plaintiffs only upon the consummation of each separate coal sale to TVA. Plaintiffs, on the other hand, maintain that the letter agreement was an installment contract because the parties' obligations were not apportioned into equivalent parts.

■ Where a contract is severable, only apportionable parts that are performed need be compensated. (*ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc.* (1980), 90 Ill. App. 3d 817, 413 N.E.2d 1299.) The question of whether a contract is entire or severable is determined largely by the intention of the parties as manifested by the specific terms of the contract. *Keeshin v. Levin* (1975), 31 Ill. App. 3d 790, 334 N.E.2d 898.

The letter agreement concerning fees is not a true divisible or severable contract as defendant asserts because plaintiffs' obligations cannot be readily apportioned with defendants' commission payments. Plaintiffs substantially performed their obligation under the agreement when Mineral secured the long-term coal supply contracts with TVA. Classic's obligation to pay commission, by contract, was to be performed over an extended period and was divided into periodic installments. Although the letter agreement is not a divisible or severable contract, we do not believe that this fact is of significance in determining Classic's liability in light of certain provisions of the agreement discussed in detail below.

■ The second argument presented by Classic is that it had no obligation to pay plaintiffs any commissions for coal which was not paid for or delivered because the actual sale of the coal was a condition precedent to defendant's duty to pay the commissions. Plaintiffs

contend that such a condition precedent was waived or excused because defendants were responsible for the nonoccurrence of the condition precedent. Specifically, plaintiffs maintain that under the doctrine of "excused condition precedent" Classic's receipt of payment from TVA did not occur because Classic breached its supply contracts with TVA. This breach, plaintiffs argue, excused the actual consummation of the coal sale to TVA as a condition precedent to Classic's duty to pay a commission to plaintiffs.

A party who deliberately prevents the fulfillment of a condition on which his liability under a contract depends cannot take advantage of his own conduct and claim that the failure of the fulfillment of the condition defeats his liability. (*Barrows v. Maco, Inc.* (1981), 94 Ill. App. 3d 959, 966, 419 N.E.2d 634, 639.) Plaintiffs contend that Classic should not be allowed to claim nonperformance of the condition precedent, the consummation of the sale, because Classic was responsible for its nonoccurrence by terminating the TVA contracts. Although we find no fault with plaintiffs' general statements of law, we cannot agree with plaintiffs' application of these rules to the particular facts of this case.

In support of their position, plaintiffs cite numerous cases which concern the recovery of commissions by a broker who has rendered assistance in finding a ready and willing buyer. In a typical case, the court stated the accepted rule that where the agreement provides that the seller will pay a commission on the consummation of the sale, he cannot avoid liability by refusing to comply with the contract when a purchaser was ready to consummate the sale. *Goldstein v. Rosenberg* (1947), 331 Ill. App. 374, 73 N.E.2d 171.

The authority presented by plaintiffs is readily distinguishable from the present case in that those cases involve a single transaction in which a broker was to receive a commission payable out of the proceeds of the sale or upon actual consummation of the sale. In the instant case plaintiffs were to receive commissions from a series of coal sales between Classic and TVA. This obligation to make periodic commission payments, however, was contingent upon the continuing business relationship between Classic and TVA. Despite this contingency, the agreement between plaintiffs and Classic for the payment of commissions did not require Classic to continue to supply coal under its contracts with TVA. Without such a duty imposed by the terms of the agreement, the nonperformance of the condition may not be excused. See Restatement (Second) of Contracts sec. 245 (1979).

The excused condition precedent argument advanced by plaintiffs is inapplicable to the circumstances of the present case because of the

clear language used by the parties in their agreement. In paragraph four of the letter agreement concerning fees, the parties expressly made Classic's payments of the consummation fee contingent upon its receipt of payments from coal delivered to TVA. Paragraph four specifically provides that, "[i]n the event that deliveries of coal are not made under the Subject Coal Contracts, the obligation to pay the Consummation Fee shall arise only upon receipt of, and shall apply only to, the amounts paid by T.V.A."

Additional language in the letter agreement concerning fees establishes that the parties considered the possibility that the supply contracts might be terminated. In paragraph six the parties provided that Classic would have flexibility in its dealing with TVA. This section states in pertinent part that, "[n]or shall this letter be construed to limit [Classic] in any way from dealing with T.V.A and other parties concerning the Subject Coal Contracts and performance thereunder." This paragraph goes on to state that Classic "shall have complete flexibility in conducting its business."

Classic's flexibility in its business dealings is limited by language of paragraph one which states that Classic will not alter its contractual arrangements with TVA for the "sole or main purpose of reducing the amounts to be paid to [Mineral] hereunder." Such a purpose, however, was not alleged in the complaint and thus need not be considered here. Another potential restriction on Classic can be found in paragraph four which provides that plaintiffs maintain the right to receive future fees in the event that Classic makes other arrangements with TVA regarding coal covered by the original supply contracts. This restriction, however, is also inapplicable because alternative arrangements were never made.

The rights of the parties to a contract are governed by its terms. (*Kohenn v. Plantation Baking Co.* (1975), 32 Ill. App. 3d 231, 336 N.E.2d 491.) A court may not rewrite a contract to suit one of the parties but must enforce the terms of the contract as written. *Schroud v. Van C. Argiris & Co.* (1979), 78 Ill. App. 3d 1092, 398 N.E.2d 103.

by the clear and unambiguous language of the letter agreement concerning fees, plaintiffs' right to receive commissions was contingent on the delivery and payment for the coal by TVA. The agreement does not distinguish between coal undelivered because of Classic's fault or for any other reason, and it is not within the province of the court to draw such a distinction. We believe that the flexibility which Classic is permitted in its dealings with TVA places the risk of nonperformance on plaintiffs. Any other construction would contra-

vene the express terms of the agreement and would allow plaintiffs an undeserved windfall recovery. Consequently, we find that Classic had no obligation to pay commissions on undelivered coal and therefore count II which sought to impose such liability was properly dismissed.

The second issue for review is whether defendant Adams is liable for Classic's nonperformance of the TVA contracts and its failure to pay plaintiffs' commissions. Plaintiffs contend in two counts based on two separate documents that Adams was responsible for Classic's continued payment of commissions. The merits of each count will be addressed individually with regard to the particular documents from which the allegations arose.

■ Count I is directed solely against Adams and is based upon the alleged breach of the February 15, 1977, letter agreement executed by Mineral and Adams (the 1977 letter). Plaintiffs alleged that under the terms of the 1977 letter, if Mineral secured a long-term supply contract, Adams would cause Mineral to be paid a commission of 3% of the selling price of "all coal sold pursuant to such long-term supply agreement and any coal sold pursuant to such other long-term coal supply agreements as Mineral might secure." Plaintiffs further alleged that Mineral secured two such contracts which were performed by TVA. In addition, plaintiffs alleged that Adams breached the 1977 letter agreement with Mineral by failing and refusing to cause Classic to further perform the TVA contracts.

Defendants contend that the trial court properly dismissed count I for any of three separate reasons. The grounds for dismissal stated by defendants are: The 1977 letter is unenforceable for lack of mutuality of obligation, no actionable breach of the agreement is alleged and the agreement was explicitly superseded or terminated by a later instrument. Although defendants present persuasive arguments on all three points, we need only address the second of defendants' three contentions.

Plaintiffs contend that the 1977 letter requires Adams both to pay Mineral its commissions and to cause Classic to perform fully its obligations under the supply contracts. The 1977 letter contains three provisions which deal with commissions. They state, in pertinent part, as follows:

> "(1) Mineral Resources shall receive a commission of 3% of selling price of coal sold under the long-term contract, F.O.B. trucks at the mine.
>
> (2) Mineral Resources shall receive 3% of the F.O.B. trucks selling price for any long-term contracts ***.

(3) The commission will be paid monthly to Mineral Resources within five days of receipt of remittance from the customers."

The language of the above paragraphs, we believe, contemplates a continuing business relationship in which Mineral is to be paid commissions only upon consummation of a particular sale of coal. The inclusion of the terms "coal sold under the long-term contract" in paragraph one reinforces the conclusion that Mineral's right to receive commission payments was contingent upon the delivery and payment of coal under the supply contracts. Until the occurrence of the stated contingency, Adams had no obligations under the 1977 letter with respect to the payment of commissions.

Plaintiffs' contention that Adams breached the 1977 letter by failing to cause Classic to perform its obligations under the supply contracts is based on paragraph seven which states that:

"[Adams] will cause the producing company to fully support Mineral Resources' marketing efforts on its behalf and faithfully perform its producer responsibilities."

Although the 1977 letter does not define "producer responsibilities," we do not believe that Adams had an obligation to cause Classic to perform under the supply contracts. As previously mentioned, Mineral was not entitled to commissions for the executory portion of its agreement with Classic because the actual sale of the coal was a condition precedent to the payment of commissions. Classic did not have any obligation to Mineral to continue performing under the supply contracts and, therefore, Adams had no duty to cause Classic to perform its "producer responsibilities."

Our review of the 1977 letter discloses that its provisions do not afford a basis for plaintiffs' breach of contract action. Accordingly, we find that count I was properly dismissed.

■ In count III, plaintiffs alleged that Adams breached an agreement with Mineral to cause Classic to pay commissions. The basis for this allegation is a one-page letter dated February 7, 1978 (the 1978 letter), which states, in pertinent part:

"The undersigned controlling shareholder [Adams] of [Classic] hereby consents and agrees to the foregoing Letter [agreement concerning fees] and further agrees that such Letter shall supersede the letter agreement dated February 15, 1977, between the undersigned and Mineral Resources, Inc., and any other prior agreement between the undersigned and any of the signatories hereto relative to the Subject Coal Contracts. The undersigned will use its best efforts to cause [Classic] to perform all of its obligations under such letter."

Plaintiffs alleged that the 1978 letter was delivered to Mineral at the same time the letter agreement concerning fees was executed and that plaintiffs have demanded that either Adams pay or cause Classic to pay the commissions due them. Plaintiffs further alleged that Adams breached its obligations by failing and refusing either to pay or use its best efforts to cause Classic to pay such commission.

After reviewing the 1978 letter, we are unable to say that count III states a claim based on breach of contract. We reach this conclusion based on the fact that Adams' liability under the 1978 letter necessarily depended on Classic's duty to perform its obligations under the letter agreement concerning fees. Where Classic had no obligations to perform because of the nonoccurrence of a stated contingency, Adams similarly had no duty to cause Classic to perform such obligations. Count III, therefore, was properly dismissed.

■ The final issue presented on appeal is whether the complaint states a cause of action for intentional interference with contractual relations. In count IV, plaintiffs allege that defendant Adams "without right, justification, privilege, or provocation" induced Classic to terminate deliveries of coal under the T-12 and T-14 contracts and caused Classic to breach its obligations to pay commissions under the letter agreement concerning fees.

The essential elements of tortious interference with contractual relations which are necessary to state a cause of action are existence of a valid contract, the intentional and unjustified inducement of a party to breach his contractual obligations, and the proximate incurring of damage from the breach. (*Bolger v. Danley Lumber Co.* (1979), 77 Ill. App. 3d 207, 395 N.E.2d 1066.) We believe that count IV of the amended complaint may be disposed of on the ground that there is no breach of contract. In the instant case, Classic did not have an obligation to pay commissions for coal which was neither paid for nor delivered. Consequently, Adams cannot be held liable for inducing a breach which never occurred, and thus plaintiffs' cause of action based on tortious interference with contractual relations was properly dismissed.

For the foregoing reasons, the judgment of the circuit court of Williamson County is affirmed.

Affirmed.

HARRISON, P.J., and WELCH, J., concur.