*In re* MARRIAGE OF ROBERT J. MORRIS, Petitioner and Counterrespondent-Appellee, and BEVERLY R. MORRIS, Respondent and Counterpetitioner-Appellant.

First District (1st Division)   No. 84—1809

Opinion filed July 7, 1986.—Rehearing denied October 16, 1986.

382

William J. Harte, of Chicago (Lori Klingman, of counsel), for appellant.

Grant & Grant, of Chicago (Litwin, Zurla & Stein, of counsel), for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

Respondent-counterpetitioner, Beverly R. Morris (Beverly), appeals the denial of her motion to vacate a judgment for dissolution incorporating an oral property-settlement agreement reached between her and petitioner-counterrespondent, Robert R. Morris (Robert). Beverly alleges that the settlement agreement was unfair and was obtained through fraud and coercion. For the reasons set

forth below, we affirm the denial of the motion to vacate.

The parties were married on September 11, 1948, and had three children during the marriage, all of whom were emancipated at the time of dissolution. On March 30, 1982, Robert filed a petition to dissolve the marriage on the ground of mental cruelty. Beverly generally denied Robert's allegations and filed a counterpetition. At the time the proceedings were initiated, each of the parties was 55 years old. Robert was employed as an executive with Felt-Products Manufacturing Company (referred to by the parties as Fel-Pro). Beverly, a housewife, was temporarily employed in 1983 as a hospital fund raiser.

Beverly initially retained attorney Jerome Kaplan to represent her in this matter. In March 1983, the law firm of Feiwell, Galper & Lasky, Ltd. (intervenor), now known as Feiwell, Galper, Lasky & Berger, Ltd., appeared as additional counsel in this case on behalf of Beverly. George Feiwell of the intervenor firm became the trial attorney in the case and Kaplan served as co-counsel.

To prepare the case for trial, Beverly's attorneys took numerous depositions, employed and consulted with experts and reviewed thousands of financial documents. Intervenor, through Feiwell and David Levy, along with Kaplan, also took part in numerous settlement negotiations on behalf of Beverly. It is undisputed that extensive negotiations occurred on April 3, 6, 9, and 10, 1984. The record further shows that while the negotiations were proceeding, intervenor kept Beverly apprised of the status of the settlement discussions. Beverly was present during the meetings which took place on April 9 and 10, 1984. Beverly and Kaplan kept notes of the settlement discussions.

After the basic provisions of the settlement had been reached, Beverly consulted with three attorneys, in addition to Feiwell, concerning the agreement. One of those attorneys was Kaplan. The other two were Bernard Hammer and Marshall Auerbach. After consulting with each of these attorneys, Beverly agreed to the settlement.

On April 10, 1984, a prove-up of the settlement agreement was conducted, at which time Beverly testified that she was satisfied with the provisions of the agreement and agreed to be bound by it. After hearing Beverly and Robert testify at the prove-up, the trial court concluded that the settlement was "fair, just and equitable" and would be incorporated into the judgment for dissolution. The agreement approved by the court provides that Beverly is to receive the following assets and maintenance:

| ASSET | VALUE |
|---|---|
| Marital home | $200,000[1] |
| 1981 Buick | 5,000 |
| California time sharing condominium investment | 20,000[2] |
| Half of Israeli bonds | 3,000 |
| $125,000 up front (as portion of profit-sharing plan) | 125,000 (after taxes) |

### MAINTENANCE

| | |
|---|---|
| If Unmarried | -First 7½ years: 25% of Robert's yearly gross income. The amount of maintenance is not to exceed $175,000 per year and in no event is it to be less than $100,000 per year. <br> -Thereafter: $100,000 per year. |
| If Remarries | -First 7½ years: 25% of Robert's yearly gross income. The amount of maintenance is not to exceed $175,000 per year and in no event is it to be less than $100,000 per year. <br> -Next 7½ years: $75,000 per year. <br> -Thereafter: $50,000 per year. |

Robert receives the following assets under the settlement agreement:

| ASSET | VALUE |
|---|---|
| Fel-Pro realty & stock | $6 million (nonmarital) |
| Robert's life estate in revocable trust, corpus of which is Fel-Pro realty and stock | no value[3] |
| Robert's profit-sharing plan | 415,000 (before taxes paid on all $540,000) |
| Half of Israeli bonds | 3,000 |
| Liquid assets less liabilities | 500,000 (nonmarital) |

[1]Robert is to assume responsibility for the outstanding mortgage payments in the amount of $10,000.

[2]Valued for settlement purposes, but not specifically stated in the prove-up transcript.

[3]Robert states that no value was provided because he only receives disbursements of dividends; he cannot invade the life estate or use it for any purpose.

The agreement further provides that Robert, and his estate should he die, guarantee that Robert's employer, Fel-Pro, shall continue to provide medical insurance coverage for Beverly until her death.

Several days after the April 10, 1984, prove-up, Beverly indicated to Kaplan that she was unhappy with the settlement agreement. She retained new counsel who filed a motion to vacate the judgment for dissolution, alleging that Beverly was forced into settling the case by Feiwell while she was in a state of diminished capacity and therefore did not understand the agreement. The motion further alleged that the agreement was unfair and inequitable.

At the hearing on the motion to vacate, Beverly testified that Feiwell told her that he would not try the case for her if it did not settle and that she would be "out in the cold." On cross-examination, however, she was impeached by her statement in her deposition wherein she admitted that Feiwell had confirmed on the evening of April 8, 1984, that he would in fact try her case.

Beverly also attempted to show at the hearing that she did not understand the agreement during the April 10 prove-up as a result of her diminished capacity. She testified that she was over medicated, exhausted and had consumed too much coffee. She testified on direct examination that she knew how many pills she took on April 10, 1984, because she counted the pills which remained in the bottles. On cross-examination, however, Beverly stated she could not remember how many pills remained in her bottles after the evening of April 10. She also admitted that she never complained during the prove-up that she was over medicated or had consumed too much coffee.

Beverly called two doctors in her behalf at the hearing. First, Dr. Franklin Miller testified that Beverly is his patient, but that he did not have personal contact with her during the week of April 3 through 10. His only contact with her during this period was over the telephone. With regard to Beverly's condition on April 10, Dr. Miller stated that her cognitive ability might have been impaired, but admitted he did not know to what extent. He stated he could not make a judgment as to whether Beverly was able to understand what was occurring in court on April 10, 1984. Dr. Miller testified, however, that if Beverly was as over medicated and in the distress she alleged, he would expect that her countenance would be contorted and that she would have trouble staying awake. He further stated that if Beverly had consumed the amount of medication she claimed to have taken, she would have difficulty answering questions. After reading a transcript of Beverly's testimony given at the prove-up, Dr. Miller admitted that "she certainly did not sound incoherent," and that her an-

swers to questions were in fact responsive.

Dr. Johanna Tabin, a psychoanalyst, testified that the last time she saw Beverly prior to April 10, 1984, was on April 5, 1984. Dr. Tabin spoke to Beverly on the telephone during the evenings of April 9 and 10, but did not see or talk to her at any time in between. Dr. Tabin admitted that it would be difficult to give a clinical impression of a person on a particular day if she had not seen or spoken to the person on that day.

Beverly also called as a witness Jerome Kaplan, who testified that he has 30 years of experience as an attorney and that his expertise is in family law. Kaplan stated that during the course of his representation of Beverly she decided to also retain George Feiwell because he was more experienced and aggressive, and had better trial skills. Kaplan agreed with this assessment of Feiwell. Kaplan testified that on the evening of April 9, 1984, after an entire day of negotiations, the parties and all the attorneys carefully recited the settlement agreement that had been reached to ensure that everyone understood it. Attorney David Levy of Feiwell's firm reviewed each provision of the agreement with Beverly. At her request, Levy talked very slowly and repeated points of the agreement to her. Kaplan stated he believed that after Levy finished, Beverly understood the entire agreement. Following the meeting, Kaplan admitted to Robert's attorney that the agreement was generous to Beverly.

Kaplan further testified that on the day of the prove-up Beverly insisted on speaking to Robert alone for the purpose of persuading him to provide her with maintenance even after her remarriage. Beverly was ultimately successful in this endeavor. At the April 10 prove-up, the agreement recited was virtually the same as that explained by Levy the previous night, except that it included the improvement that Beverly negotiated herself with respect to maintenance after remarriage and the security for the agreement was specifically spelled out. Kaplan testified he believed Beverly understood the agreement at that time. Beverly did not complain to him on April 10, 1984, that she had not slept or was over medicated.

Kaplan stated he raised no objections to the agreement at any time during the prove-up. Notwithstanding this fact, he admitted that on the day after the prove-up, he told Beverly that the agreement was unfair to her and that she was entitled to a more substantial "payment in front" because: (1) Robert's liquid assets were $800,000 to $900,000, rather than the $500,000 represented by Robert at his deposition, and (2) Robert had undervalued his Fel-Pro stock by $10 million. Upon further cross-examination, Kaplan admitted that Robert

received the Fel-Pro assets as a gift from his mother and that long before the prove-up he and Beverly believed the Fel-Pro stock was worth $15 to $25 million, instead of the $6 million listed on the statement of assets.

Kaplan acknowledged that within a few days after this conversation with Beverly, she called him and said that "she had changed her mind and no longer wanted the agreement because she was unhappy with it." Beverly complained that she would need a better settlement economically and particularly more "front money," better medical insurance, more maintenance and more money to repair her home.

Kaplan further admitted there was no doubt in his mind that Feiwell would have tried the case for Beverly if no settlement were effectuated. He stated that Feiwell repeatedly told Beverly he would try her case if it did not settle. Beverly, however, told Feiwell approximately five times that she did not want to go to trial.

George Feiwell testified that he was with Beverly on April 3, 6, 9, and 10, 1984. He did not see her take any pills on those days, nor did she ever complain to him of being over medicated, having headaches, being unable to understand him, or not having slept. Feiwell stated that Beverly was apprehensive about going to trial and he repeatedly assured her that if he could not settle the case he would personally try it. Feiwell denied telling her that she would be "out in the cold" if she did not settle. Feiwell stated he attempted to reach a settlement because Beverly indicated she did not want the case to go to trial and he believed he could obtain numerous benefits by way of settlement that a trial judge could not order.

After hearing all the evidence presented by the parties, the trial court denied the motion to vacate. The court concluded that Beverly had voluntarily entered into the settlement agreement and had fully understood its terms.

■■ ■ In reviewing the propriety of the trial court's ruling, we initially observe that the law favors the amicable settlement of property rights in marital dissolution cases. (*In re Marriage of De Frates* (1980), 91 Ill. App. 3d 607, 414 N.E.2d 1188.) When the provisions of a written or oral agreement are incorporated into the judgment, the agreement becomes merged in the judgment and is conclusive upon the parties in the same manner as if the court had made the determination. (*Stutler v. Stutler* (1978), 61 Ill. App. 3d 201, 377 N.E.2d 862.) The property agreement will only be set aside by the court if it is shown that the agreement was procured through coercion, fraud or duress (*In re Marriage of Beck* (1980), 83 Ill. App. 3d 976, 404 N.E.2d 972), or if it is found to be unconscionable (Ill. Rev. Stat. 1983, ch. 40,

par. 502(b)).

██ With these principles in mind, we turn first to Beverly's argument that the settlement agreement must be set aside because it is unfair and inequitable. As noted above, however, the standard which this court must apply is not whether the agreement is merely unfair, but whether it is unconscionable. (*In re Marriage of Kloster* (1984), 127 Ill. App. 3d 583, 469 N.E.2d 381.) An agreement is unconscionable when it is improvident, totally one-sided or oppressive. *In re Marriage of Riedy* (1985), 130 Ill. App. 3d 311, 474 N.E.2d 28.

██ After reviewing the provisions of the settlement agreement, we find that Beverly in fact received an extremely generous settlement. The marital estate contained two major assets: the marital home in suburban Glencoe, valued at $200,000, and Robert's deferred-compensation plan, which was valued at $540,000 prior to taxes. Under the settlement agreement, Beverly receives the marital home and all of the personal property contained therein, and $125,000 in cash, which represents approximately one-half of the net after tax value of Robert's deferred-compensation plan. Additionally, she receives half of the Israeli bonds ($3,000), the time-sharing-condominium investment in California, valued at $20,000, the 1981 Buick and $15,000 to repair the home.

Beverly also receives a generous amount of yearly maintenance. Not only is maintenance guaranteed for her entire lifetime, but it is payable in substantial amounts even if she remarries. Specifically, under the agreement she is to receive 25% of Robert's gross income during each of the first 7½ years after the dissolution. The amount of maintenance is not to exceed $175,000 annually, and in no event is it to be less than $100,000 per year. Thereafter, she is to receive $100,000 a year until her death. In the event of her remarriage, Beverly will still receive 25% of Robert's income for the first 7½ years after dissolution. The only change resulting from her remarriage is that, after the initial 7½ year period, she would receive $75,000 a year for the next 7½ years and $50,000 a year thereafter.

The settlement agreement additionally provides for Beverly's expressed concerns that it be properly secured and that her medical expenses be covered. As security, the agreement requires that Robert set up a trust in which all the income from the Fel-Pro stock must be deposited. If Robert defaults on any of his payments, the trustee is to pay Beverly the amount necessary to provide her with the maintenance required under the agreement. If Robert dies while Beverly is still alive, the funds from Robert's profit-sharing plan must be paid into a trust with life insurance benefits so that a total of $1 million is

deposited into the trust. To cover her medical expenses, Robert guarantees the continuation of insurance coverage for Beverly by Fel-Pro.

Clearly, the settlement agreement is particularly advantageous to Beverly because it provides her with many substantial benefits that she could not be awarded from a trial court. First, a trial court does not have the power to force Robert to continue the Fel-Pro medical insurance for Beverly, particularly since Fel-Pro is not a party to this action. Secondly, a trial court is precluded from awarding Beverly any maintenance if she remarries. (Ill. Rev. Stat. 1983, ch. 40, par. 510(b).) Additionally, because a court's determination of the amount of maintenance is based in large part upon the parties' standard of living during the marriage (Ill. Rev. Stat. 1983, ch. 40, par. 504(b)(3)), Beverly would not be able to receive as much maintenance as is provided in the settlement agreement. The record shows that during the marriage the parties' gross income never exceeded $250,000 and was normally lower. The settlement agreement provides Beverly with as much or more in yearly maintenance as the parties netted per year during all but one year of their marriage. A trial court could not order an amount of maintenance of up to $175,000 given the standard of living of the parties during their marriage.

We additionally note that under the Illinois Marriage and Dissolution of Marriage Act, the obligation to pay maintenance terminates upon the death of either party. (Ill. Rev. Stat. 1983, ch. 40, par. 510(b).) In this case, however, Beverly would continue to receive maintenance even after Robert dies. The settlement agreement specifically provides that if Robert dies during the 7½ years following the entry of the judgment for dissolution, Beverly will receive maintenance in the amount of $137,500 annually from the date of his death until the expiration of the 7½ year period. Thereafter, she will receive maintenance in accordance with the terms and conditions described above.

■ Beverly argues that the settlement is unfair because the Fel-Pro realty and stock were undervalued on Robert's statement of assets and no value was placed on the life interest Robert has in a trust which owns much of the Fel-Pro stock. She also contends that the maintenance is insufficient because Robert had a gross income in 1983 of more than $800,000. We find, however, that the foregoing facts do not make the settlement unconscionable. The undisputed testimony shows that all of the Fel-Pro assets were acquired by Robert as a gift from his mother. Five hundred thousand dollars of Robert's 1983 gross income and the majority of his liquid assets were the result of Fel-Pro stock dividends. Under section 503(a) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1983, ch. 40, par.

503(a)), those assets and income are defined as nonmarital. Specifically, section 503(a) provides that nonmarital property includes:

"(1) property acquired by gift, legacy or descent; [and]

* * *

(8) income from property acquired by a method listed in paragraphs (1) through (7) of this subsection if the income is not attributable to the personal effort of a spouse." (Ill. Rev. Stat. 1983, ch. 40, pars. 503(a)(1), (a)(8).)

Given that a trial court is required to assign nonmarital property to the spouse to whom the property belongs (Ill. Rev. Stat. 1983, ch. 40, par. 503(d)), Beverly has failed to demonstrate that the settlement is unconscionable.

Next, we address Beverly's argument that she entered into the settlement agreement under duress caused by Feiwell. Duress is defined as including the imposition, oppression, undue influence or the taking of undue advantage of the stress of another whereby one is deprived of the exercise of his free will. (*In re Marriage of Riedy* (1985), 130 Ill. App. 3d 311, 474 N.E.2d 28.) Evidence of duress must be clear and convincing in order for a court to set aside the agreement on this basis (*In re Marriage of Carlson* (1981), 101 Ill. App. 3d 924, 428 N.E.2d 1005), and the burden of proving duress is on the person asserting it (*In re Marriage of Reidy* (1985), 130 Ill. App. 3d 311, 474 N.E.2d 28).

Here, Beverly argues that she entered into the settlement agreement under duress because Feiwell pressured her to settle the case. She alleges that Feiwell told her "the case should not go to trial, that there was an abundance of money to settle it." Beverly also alleges that Feiwell warned her that either they settle the case or she would be "out in the cold." Beverly states she assumed that this meant Feiwell would not try the case for her.

After reviewing the testimony presented at the hearing on the motion to vacate, we find no basis for Beverly's claim of duress. Beverly admitted on cross-examination that she knew Feiwell would go to trial for her. Jerome Kaplan, Beverly's own witness, also testified there was no doubt in his mind that Feiwell would try the case if a settlement was not effectuated. Feiwell denied telling Beverly that she would be "out in the cold" and testified that he repeatedly told Beverly he would try the case if no settlement was reached. Although Feiwell does not deny that he recommended that Beverly settle the case, he correctly notes that the settlement agreement provided far more benefits to her than a trial court could have awarded.

Under the facts and circumstances before us, we find that the advice given by Feiwell to settle the case does not constitute duress. The only pressure which Beverly felt is the anxiety which is prevalent in any lawsuit. Every litigant must at one time or another decide whether or not to settle or go to trial. Beverly was faced with a trial that was scheduled to start the next day, and after consulting with three additional attorneys, she elected to settle her case rather than accept the uncertainty of trial. As this court has previously observed, it is far from uncommon for parties in divorce proceedings to feel upset and under great pressure, but this does not of itself imply coercion. *In re Marriage of Riedy* (1985), 130 Ill. App. 3d 311, 474 N.E.2d 28.

■ Beverly argues next that the settlement agreement was the result of fraudulent misrepresentations by Robert on his statement of assets. To sustain a claim of fraud, the following elements must be proved: (1) false statement of material fact; (2) known or believed to be false by the party making it; (3) intent to induce another party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party relying on such statement. (*In re Marriage of Wanic* (1983), 112 Ill. App. 3d 740, 445 N.E.2d 1272.) Fraud must be proved by clear and convincing evidence (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 446 N.E.2d 499), and the trial court's decision as to this matter will not be set aside unless it is against the manifest weight of the evidence. *Bellow v. Bellow* (1976), 40 Ill. App. 3d 442, 352 N.E.2d 427.

■ Here, Beverly alleges three fraudulent misrepresentations by Robert. As her first example of misrepresentation, Beverly relies on Kaplan's testimony that Robert had represented at his deposition that he had only $500,000 in liquid assets, while his statement of assets listed his liquid assets in excess of $800,000. We note that on cross-examination, however, Kaplan admitted that Robert's representation at the deposition was not that he had liquid assets of $500,000, but rather that his total liquid assets less his taxes and liabilities equaled $500,000. When Kaplan, while on the witness stand, took Robert's affidavit and subtracted the taxes and liabilities from his liquid assets, Robert's net assets were actually less than the $500,000 represented. Accordingly, we find no basis for Beverly's first claim of misrepresentation.

■ As her second example of fraud, Beverly alleges that the Fel-Pro stock and real estate were undervalued on the statement of assets. As intervenor notes, however, the figure provided in the statement was arrived at by the accounting firm of Warady & Davis,

who were hired by Beverly for the purpose of determining the value of the Fel-Pro assets. As such, Beverly can hardly complain about this figure. Additionally, Kaplan admitted at the hearing that long before the prove-up, he and Beverly believed the Fel-Pro stock was worth 15 to 25 million dollars. As a result, Beverly has failed to establish the necessary element of reliance. Moreover, as previously noted herein, the Fel-Pro stock and realty were obtained by Robert as a gift from his mother and thus this property is nonmarital, as is the income received therefrom. Because the Fel-Pro assets could not be included in the marital estate, their value would not necessarily have affected the property settlement. As established above, to demonstrate fraud, a party must prove by clear and convincing evidence that he was damaged by the misrepresentation. Here, given the fact that the Fel-Pro assets are nonmarital and that the settlement agreement was so generous to Beverly, even assuming the facts as alleged by Beverly, she has failed to demonstrate by clear and convincing evidence that she could obtain a better deal from the trial court. As such, she has failed to establish any damage.

As her final example of fraud, Beverly argues that Robert's statement of assets omitted the values of certain trusts and a life estate he held. The life estate is in a trust which owns much of the Fel-Pro stock. Robert, however, cannot invade the trust and is only entitled to income, which is nonmarital. We find that once again Beverly has failed to show by clear and convincing evidence any damage resulting from the alleged misrepresentation as to the life estate. Furthermore, Robert did not misrepresent the value of the life estate but just placed no value on it. Finally, the other trusts objected to by Beverly were set up with the parties' children as beneficiaries and, as such, are not part of the marital estate.

We conclude, for the reasons stated above, that the trial court's determination that Beverly failed to prove fraud was not against the manifest weight of the evidence.

We next consider Beverly's argument that the settlement agreement must be set aside because she was physically and emotionally impaired and therefore lacked the capacity to understand its provisions. Beverly testified that on the day of the prove-up she had taken valium, codeine and digoxin, and drank too much coffee. She also stated that she had not slept for days prior to the prove-up and that she was suffering from severe migraine headaches.

It is held that for a marital settlement agreement to be valid, the parties must have had the necessary mental capacity and understanding to enter into the agreement; the burden rests upon

the party challenging the agreement to prove lack of capacity or understanding. (*Curry v. Curry* (1975), 31 Ill. App. 3d 972, 334 N.E.2d 742.) Given that the trial judge has the best opportunity to observe the witnesses and evaluate their credibility, his findings in this regard will not be disturbed unless they are palpably erroneous. 31 Ill. App. 3d 972, 976, 334 N.E.2d 742.

██ Beverly has failed to demonstrate that the trial court was palpably erroneous when it ruled that she understood the settlement agreement at the time of the prove-up. The evidence shows that during the prove-up Beverly never complained of any physical or emotional problems. Furthermore, Beverly admitted that she spoke to Robert on the day of the prove-up and that during that conversation she was able to effectuate an agreement with him which provided additional support for her beyond her remarriage. If Beverly was so incapacitated that she could not understand the settlement agreement, it is unlikely that she could have obtained this additional benefit.

Moreover, neither of the doctors who testified on Beverly's behalf could state that she lacked the capacity to understand the settlement at the time of the prove-up. In fact, one of the doctors acknowledged that given the problems alleged, Beverly would likely have had readily visible symptoms such as facial contortions or drowsiness. The record discloses that no such visible symptoms were evident at any time on April 10, 1984. Additionally, one of the doctors, after reviewing Beverly's answers to questions at the prove-up, admitted that "she certainly did not sound incoherent."

██ Beverly also asserts that she did not understand the settlement agreement because it was not written down and was constantly changing. Such an assertion is groundless. Beverly and Kaplan admitted at the hearing that both of them wrote down the terms of the agreement on many occasions during the negotiations. Beverly and Kaplan further acknowledged that on the evening of April 9, 1984, David Levy of Feiwell's firm went over every aspect of the agreement. Thereafter, virtually the only significant change in the agreement was the one negotiated by Beverly herself concerning maintenance if she remarried. Finally, Beverly conceded on further cross-examination that she did in fact understand the provisions of the settlement agreement on April 10, 1984, the date of the prove-up.

██ The facts before us indicate that Beverly merely had a change of heart following the prove-up and decided to have the settlement set aside. It is clear, however, that a settlement agreement incorporated into a judgment for dissolution will not be vacated

based on a mere change of heart of one of the parties. (*Horwich v. Horwich* (1979), 68 Ill. App. 3d 518, 386 N.E.2d 620; *Stutler v. Stutler* (1978), 61 Ill. App. 3d 201, 377 N.E.2d 862.) Beverly testified at the prove-up that she was satisfied with the agreement and chose to be bound by it. If Beverly now believes she exercised bad judgment in agreeing to the settlement, neither Robert nor the court is obligated to give her a second negotiating opportunity.

We observe that Beverly, in her reply brief, relies on a recent opinion by this panel, *In re Marriage of Moran* (1985), 136 Ill. App. 3d 331, 483 N.E.2d 580. In *Moran,* we found that a settlement agreement incorporated into a judgment for dissolution was procured through fraud and coercion exerted upon the wife and was unconscionable. We therefore vacated the agreement and remanded the cause for a new trial. Beverly's attorney, at oral argument before this court, asserted that the instant facts and circumstances present a more compelling case than *Moran* for a new trial.

We strongly disagree with such an assertion. Even a cursory reading of *Moran* reveals that it differs from the present case in many significant respects. First, in *Moran,* it was undisputed that the wife's attorney coerced her into settling by threatening to quit on the eve of trial if she did not agree to the settlement. In this case, the evidence establishes that Feiwell was ready, willing and able to go to trial on Beverly's behalf if the case was not settled. Additionally, in *Moran,* the uncontroverted evidence showed that the trial judge repeatedly misled the wife about the law and erroneously warned her that she could do no better at trial. No misrepresentations by the trial judge in the present case are alleged. In further distinction to the instant case, the wife in *Moran* had repeatedly objected to the settlement, both orally and in writing, prior to the prove-up. Finally, we found in *Moran* that the settlement agreement was unconscionable and that the wife could not have done any worse at trial. Here, the agreement is actually quite generous to Beverly and provides her with significant benefits she could not have obtained at trial. These are just a few examples of the numerous factual distinctions existing between *Moran* and the present case. As such, *Moran* is not persuasive analogy to this case.

We finally note that Beverly challenges the portion of the settlement agreement providing that her attorneys are to be paid $100,000. She raises two objections in her brief to the attorney fees: (1) the fees are unreasonable; and (2) she is financially unable to pay them. However, neither in her petition to vacate or at the hearing on that petition did Beverly make any allegation that the attorney

fees are unreasonable or that she is unable to pay the fees. In fact, when Feiwell testified on cross-examination as to the division of the attorney fees, Beverly's attorney had that testimony stricken. Having failed to properly raise these issues during the proceedings below, Beverly has waived them for our review. *In re Marriage of Hirsch* (1985), 135 Ill. App. 3d 945, 482 N.E.2d 625.

■ Even if we were to consider this issue, Beverly's challenge to the fees must nevertheless fail. While the supplemental judgment for dissolution provides that Beverly is to pay her own attorney fees, Beverly admits in her brief that Robert is to pay her an additional $100,000 to cover the fees. Beverly can hardly complain she has insufficient funds to pay the fees when the agreement provides funds to her specifically for this purpose.

■ Beverly further has failed to demonstrate that the fees are unreasonably high. We note that at the prove-up, Beverly was specifically questioned about the fee award. At that time, she agreed that $100,000 would be paid to Feiwell, Levy and Kaplan and she did not indicate any dissatisfaction. We are unable to conclude that the fees are excessive given the amount of experience, skill and expertise possessed by the attorneys representing Beverly and the significant benefits obtained on her behalf. Additionally, an extensive degree of responsibility was undertaken by her attorneys given the large sums of money involved in this case. Under these circumstances, Beverly's challenge to the fees must fail.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.