RICHARD S. FLEISHER, Plaintiff-Appellant and Cross-Appellee, v. NORMAN LETTVIN *et al.*, Defendants-Appellees and Cross-Appellants.

First District (3rd Division)   Nos. 1—88—2176, 1—88—2728 cons.

Opinion filed May 23, 1990.

Donald J. O'Brien, Jr., and David A. Novoselsky & Associates, both of Chicago (David A. Novoselsky and Linda A. Bryceland, of counsel), for appellant.

Harvey J. Barnett & Associates, Ltd., of Chicago (Michael S. Blazer, of counsel), for appellees.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Richard Fleisher, brought a four-count complaint against defendants Norman and Roslyn Lettvin *et al.*, to recover damages incurred from plaintiff's purchase of residential property from defendants. After the close of plaintiff's case in chief, the trial court entered judgment for defendants on counts III and IV of plaintiff's complaint. After the close of all the evidence, the trial court entered judgment for defendants on counts I and II of plaintiff's complaint. Thereafter, the trial court denied defendants' motion for attorney fees and costs under section 2—611 of the Civil Practice Law (Ill. Rev. Stat. 1987, ch. 110, par. 2—611). Plaintiff appeals the judgments for defendants. Defendants appeal the denial of their section 2—611 motion. The appeals have been consolidated.

Count I of plaintiff's complaint sounded in fraud. It alleged that, after he took possession of the premises purchased from defendants, located at 345 Cedar Avenue in Highland Park, Illinois, plaintiff learned that: (1) there was water damage to the structure; (2) water flowing through the gutter system, which was contained within the walls of the structure, was leaking into the structure's interior walls; (3) the leaking had damaged the electrical system, electrical conduits, insulation and lathe and plaster work; (4) the garage door opener was defective and unusable; and (5) the plumbing system was defective and unusable and not in the condition warranted to plaintiff. Count I further alleged that defendants were aware of the leakage condition, the defective plumbing and garage door opener; contracted with vari-

ous repairmen and roofers over a period of years to secure estimates on repairs but had made none; and had concealed the water damage with wallpaper and patchwork plastering, which prevented plaintiff from discovering it.

Count II alleged that the alleged defects in the structure constituted a breach of a warranty to plaintiff contained in the real estate contract with defendants that "the mechanical, electrical, plumbing, heating and cooling systems and appliances are in good working order and will be maintained up to and including the date of possession." It further alleged that plaintiff had relied on the warranty. Count III of plaintiff's complaint alleged that defendants' misrepresentations of the condition of the premises were negligent. Count IV alleged that defendants' misrepresentations constituted a violation of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1981, ch. 121½, par. 261, et seq.).

The testimony at trial is too voluminous to allow a witness-by-witness summary sufficient to give a clear understanding of their often conflicting and varying testimony. Therefore, we will at this point set forth only those facts essential to a basic understanding of this case.

Plaintiff and defendants entered a real estate contract for the purchase and sale of the premises involved (hereinafter the house) in July 1982. Plaintiff's wife (hereinafter Mrs. Fleisher) had been shown the home in the spring of 1982 for the first time. During a subsequent visit by plaintiff and his wife (hereinafter the Fleishers), they noticed signs of water damage in the walls of two bedrooms on the second floor and in the basement. The Fleishers thus inquired about water damage to the house and were specifically told that it resulted from a 1979 winter storm. Subsequently one or both of the Fleishers returned to the house with various individuals to inspect it further. One of these was Paul Cocose, the president of Mayfair Construction Company (Mayfair), a general contractor. He also noticed and therefore inquired about water damage to the house. Plaintiff and Cocose claimed at trial that in response they were told only of the 1979 winter storm. After this inspection, Cocose did not advise against the purchase of the house.

Prior to signing the real estate contract, plaintiff requested another inspection of the house. During this inspection, Ira Kephart, a licensed architect employed as a project manager by Mayfair, accompanied plaintiff and Cocose. During this inspection, all three men again noticed signs of water damage and conjectured as to its causes. Kephart testified that he told plaintiff that it could not be determined whether there was any water damage in the second-floor walls of the

house without opening them up, that it could not be determined whether there was a problem with the gutter and downspouts of the house because they were an interior type, installed inside the exterior wall of the house. He also told him that there could be a problem with water draining from the roof but that, without opening up the roof, they would have to rely on what defendants told them. As a result of his inspection, Kephart advised plaintiff that the house required $14,400 worth of repairs. Plaintiff reduced his offer for the house accordingly.

Also before signing the contract, Mrs. Fleisher took Mr. Soprani of Superior Sheet Metal (Superior), a specialist in copper gutters, to examine the condition of the gutters on the house. Soprani attempted to determine whether there was any water in the walls by placing a meter on the surface but was unsuccessful because of their thickness. He therefore stated that the only way to make that determination was to open the walls up.

The Fleischers eventually took possession of the house in January 1983. However, they did not move in until May 1983. In the interim, they employed Mayfair and others to perform major renovations and repairs to the house.

In entering judgment for defendants on count I, the trial court found that plaintiff had failed to prove *scienter* on defendants' part or reliance on defendants' alleged misrepresentations. In entering judgment for defendants on count II, the court found that defendants had not breached the term of the contract with plaintiff requiring that "the mechanical, electrical, plumbing, heating and cooling systems and appliances be in good working order and be so maintained up to and including the date of possession," whether or not that term constituted a warranty.

On appeal, plaintiff contends the trial court's findings were against the manifest weight of the evidence.

I

Initially, plaintiff contends that he established that defendants knew of leakage problems in the house's gutter system, specifically the downspouts. The trial court's reliance on defendants' inability to observe the gutter system, plaintiff asserts, ignored that defendants could and did observe the effects of the defects in the downspouts. Plaintiff therefore argues that this knowledge imposed upon defendants the duty to inform plaintiff of the prior damage caused by this problem and the prior repairs necessitated thereby.

■■ ■ In an action for fraud, each of the elements of the action

must be proved by clear and convincing evidence. (*In re Marriage of Morris* (1986), 147 Ill. App. 3d 380, 497 N.E.2d 1173.) Moreover, on review of a judgment in such an action, the applicable inquiry is whether the judgment is against the manifest weight of the evidence. (*Morris*, 147 Ill. App. 3d 380, 497 N.E.2d 1173.) A judgment is not against the manifest weight merely because there is sufficient evidence to support a contrary judgment. (*Chicago Title & Trust Co. v. First Arlington National Bank* (1983), 118 Ill. App. 3d 401, 454 N.E.2d 723.) Rather, to satisfy that standard the opposite conclusion must be clearly evident, and a reviewing court will not overturn the judgment merely because it would have reached a different conclusion had it been the trier of fact. (See *In re J.H.* (1987), 153 Ill. App. 3d 616, 505 N.E.2d 1360.) Finally, we note that a vendor of a used home has a duty to disclose facts which: (1) materially affect the value or desirability of the property; (2) are known or accessible only to him; and (3) he knows are not known or accessible to a diligent buyer. *Posner v. Davis* (1979), 76 Ill. App. 3d 638, 395 N.E.2d 133.

■ Applying the foregoing principles here, we affirm the judgment of the trial court on count I of plaintiff's complaint. The parties cite conflicting testimony in the record or draw conflicting inferences of fact from undisputed testimony in support of their diametrically opposed positions. In view of that evidence and those inferences, we cannot say that the trial court's judgment was against the manifest weight of the evidence. Simply put, given the conflicting evidence at trial with respect to what defendants knew and when they knew it, it is not clearly evident that they made knowingly false representations with respect to, or fraudulently concealed, any defects in the house. See, *e.g., First National Bank v. Chrysler Realty Corp.* (1988), 168 Ill. App. 3d 784, 790, 522 N.E.2d 1298.

Plaintiff cites the following evidence as proof of defendants' fraudulent concealment of the water-damaged condition of the house. Defendants had repairs made to some interior downspouts in 1973 and 1976. The 1976 repairs consisted of the installation of a "scupper box" to divert water away from one of the interior downspouts and the installation of an exterior downspout in its place. Additionally, in 1978, James McDonald, a painter employed by defendants to work on the premises, found mildew on the south wall of two second-floor closets and informed Mrs. Lettvin that there was moisture "coming in somewhere" and it had to be fixed. Mrs. Lettvin told him to fix it the best way he could. At trial, Mrs. Lettvin denied employing anyone to put a plywood or masonite panel in one of the second-floor closets. However, plaintiff impeached this testimony with Mrs. Lettvin's

deposition testimony that a painter had advised her to put up such a panel in the closet and that she had observed "black streaks" on the wall at that time. Similarly, Mr. Lettvin testified at trial that he was not aware of a mildew condition in the second-floor closets before dealing with the Fleishers. However, he too was impeached with his deposition testimony that a painter who had done some painting for him had believed back then that there was mildew in the closets above the garage.

It may be reasonable to infer from the foregoing evidence that defendants knew of but failed to disclose problems in the interior gutter system. However, we do not find that conclusion clearly evident from the foregoing evidence.

Specifically, the fact that an interior downspout was repaired in 1973 does not alone make fraudulent concealment of that fact clearly evident absent evidence that the damage found by plaintiff after purchasing the house was somehow connected to that downspout. Moreover, plaintiff's allegation of fraudulent concealment of the scupper box and exterior downspout installed in 1976 completely ignores the evidence which tended to show that both Kephart and Soprani conducted inspections of the exterior of the house, the latter for the specific purpose of determining the condition of the gutters. As plaintiff's agents conducted exterior inspections of the house, he cannot now complain that an exterior downspout was not disclosed to him, especially absent evidence that the downspout was not visible from the outside. *Cf. Seefeldt v. Millikin National Bank* (1987), 154 Ill. App. 3d 715, 506 N.E.2d 1052 (person may not enter into transaction with eyes closed to available information and then charge that he has been deceived); *Carter v. Mueller* (1983), 120 Ill. App. 3d 314, 457 N.E.2d 1335 (plaintiff is not justified in relying upon representations made when he has ample opportunity to ascertain truth of representations before he acts).

Moreover, that defendants had the interior gutter system repaired in 1973 and 1976 does not compel the conclusion that they must have known that the moisture in the closet in 1978 was caused by problems with the gutters. In addition, while Mrs. Lettvin knew the black streaks on the wall of the upstairs closet wall were caused by moisture, it is not clearly evident that she knew that the moisture was coming from the interior gutter system. McDonald also testified that he did not know the source of the moisture and that it might have been coming through the exterior wall. The evidence of any knowledge on defendants' part that the moisture and mildew problems in the upstairs closet were caused by problems in the gutter system is

insufficient for us to conclude that such knowledge is clearly evident in the record before us.

Plaintiff also relies on the evidence of basement flooding as imposing a duty upon defendants to disclose the water entry problem in the house. However, we find the testimony of facts giving rise to an inference of basement flooding of little avail to plaintiff in proving fraudulent concealment of that fact by defendants.

The signs of flooding in the basement observed by plaintiff and his agents, which were obvious to anyone inspecting the basement, put plaintiff as much on notice of the probability of basement flooding as any disclosure by defendants would have. As already noted, one cannot shut his eyes to available information and then charge that he has been deceived. *Seefeldt v. Millikin*, 154 Ill. App. 3d 715, 506 N.E.2d 1052.

Moreover, not having taken any apparent steps to conceal the signs of flooding, defendants had no duty to disclose the possibility or fact of flooding. Additionally, defendants did disclose to the Fleishers the fact of two floodings caused by spring rainstorms. Plaintiff failed to prove, either directly or circumstantially, that there were other floodings of the basement and that defendants knew of other floodings. In view of the foregoing, we find insufficient record evidence to show a clearly evident fraudulent concealment of the fact of basement flooding by defendants. *Cf. Posner v. Davis* (1979), 76 Ill. App. 3d 638, 395 N.E.2d 133; *Russow v. Bobola* (1972), 2 Ill. App. 3d 837, 277 N.E.2d 769 (silence accompanied by deceptive conduct or suppression of material facts results in active concealment, and it then becomes the duty of a person to speak).

Plaintiff further relies on the evidence of the 1979 winter storm damage, which both plaintiff's and defendants' witnesses agreed defendants informed the Fleishers of, as also imposing a duty of disclosure upon defendants. However, we cannot see how that evidence, *i.e.*, evidence of a disclosure, is of any avail to plaintiff in proving fraudulent nondisclosure by defendants.

Additionally, plaintiff asserts that defendants' awareness that the roof of the house needed extensive repairs, in that a roofing company had recommended replacement of the entire roof, also proved fraudulent concealment by defendants in that they failed to inform the Fleishers thereof.

This assertion ignores Kephart's testimony that upon noticing the infiltration of water into the walls of the structure, while working there for Mayfair after plaintiff purchased the house, he examined the roof and found only a couple of small areas of minor leaking which

were not related to the water infiltration. It also ignores the testimony of Kostas Kikes, a carpenter also working for Mayfair at the house, that he examined the roof, found it in good shape and found no evidence of leaks. Given this testimony, we do not find the conclusion that defendants concealed the need for extensive repairs, or for replacement of the entire roof, clearly evident from the record. In this regard, we believe that, for fraudulent concealment to occur, that which a plaintiff alleges a defendant concealed must be an actual fact. One cannot be damaged by the concealment of that which does not later turn out to be true in fact.

As further proof of fraudulent concealment, plaintiff cites the testimony of Harry Hugel, a garage door opener repairman for American Automatic Door Company (American Automatic), that he had recommended that defendants have the garage doors and door opener replaced. Plaintiff further cites Mrs. Lettvin's admission at trial that defendants failed to advise the Fleishers of Hugel's recommendation.

Here, too, we do not find it clearly evident from the record that defendants fraudulently concealed a defective condition of the garage doors and opener. Hugel testified that, at the time of his recommendation to defendants, the garage doors were in bad condition because the rollers had all worn out. However, he also testified that on August 12, 1982, which was subsequent to the execution of the contract, he replaced a roller on one of the doors. It is reasonable to infer from this testimony that, at the time of the execution of the contract, the garage doors and opener were functioning properly. Thus, it is not clearly evident that defendants fraudulently concealed any defects therein.

Plaintiff further relies on the testimony of Steven Braverman, a foreman for Gerson Electric Company, employed to inspect the electrical system of the house after plaintiff purchased it. Braverman testified that defendants must have been aware of the problem which Gerson's inspection revealed, *i.e.*, water damage to the electrical system, because it would have caused the circuit breakers and fuses in the house to blow out repeatedly.

Fraudulent concealment of water damage to the electrical system is not clearly evident from Braverman's testimony. Mr. Lettvin testified, and plaintiff does not dispute, that, during an inspection of the home by plaintiff and Cocose, he informed them that the electrical supply to the house was limited. He so concluded because use of several coffeemakers as well as other electric appliances during large gatherings at the house would result in power outages. Mr. Lettvin therefore advised plaintiff not to overload the system. We find Mr.

Lettvin's warnings to plaintiff and his agent sufficient to have put them on notice of a possible problem with the electrical system and, thus, to have required them to investigate further. Moreover, we note that plaintiff conceded the possibility that Cocose and Kephart examined the circuit breakers during their subsequent inspection of the house. We cannot imagine how Cocose and Kephart could have failed to detect the condition of the circuit breakers if, as Braverman testified, they were loosened by constantly being blown and reset over the years.

The foregoing are the major instances of fraudulent concealment asserted by plaintiff. In summary, while we might have reached a different conclusion than the trial court on the issue of fraud, we cannot, in reviewing that conclusion, say that the contrary conclusion is clearly evident from the record before us. As such, we need not address whether plaintiff justifiably relied on defendants' allegedly fraudulent concealment of the house's water entry problems.

## II

Plaintiff next contends that the trial court erred in entering judgment for defendants on count II. The parties' real estate contract provided, "Seller agrees that the mechanical, electrical, plumbing, heating, cooling systems and appliances are in good working order and will be maintained in the same condition up to and including the date of possession." Plaintiff asserts that this provision constituted an express warranty that specified systems would be in good working order at the time he took possession. Even if not a warranty, plaintiff alternatively argues, the quoted provision obligated defendants to turn the various systems over to plaintiff in "good working order." Plaintiff further argues that the trial court erred in relying upon *Exchange National Bank v. Heller* (1975), 26 Ill. App. 3d 675, 325 N.E.2d 328, to equate "good working order" with "good condition" and to hold that defendants were not obligated to deliver the house in perfect condition.

Defendants assert that the quoted provision merely meant that Mr. Lettvin was agreeing to the condition of the various systems in the house "to the best of his knowledge" and that plaintiff confirmed this understanding. Even assuming, *arguendo*, that the quoted provision was a warranty, defendants reason, plaintiff failed to prove his reliance thereon.

Like the trial court, we find it unnecessary to determine whether the quoted provision was a warranty. Therefore, we also find it immaterial whether plaintiff proved his actual reliance on the provision. We

do find that, as the quoted provision constituted an express term of the contract, defendants could not ignore it. Finally, whether "good working condition" is comparable to "good condition" as construed in *Heller* is of no moment.

It is well settled that courts cannot rewrite contracts to suit either party thereto but must enforce their terms as written. (*A.A. Conte, Inc. v. Campbell-Lowrie-Lautermilch Corp.* (1985), 132 Ill. App. 3d 325, 477 N.E.2d 30; *Mineral Resources, Inc. v. Classic Coal Corp.* (1983), 115 Ill. App. 3d 114, 450 N.E.2d 379.) Moreover, where contract terms are clear and unambiguous, they must be given their ordinary and natural meaning and no parol evidence can be considered to vary their meaning. (*Lewis v. Loyola University* (1986), 149 Ill. App. 3d 88, 500 N.E.2d 47.) We find the language of the provision at issue to be clear and unambiguous. As such, no parol evidence was admissible to vary its ordinary and natural meaning. Thus, that Mr. Lettvin may have understood the provision to mean that the specified systems were in good working order to the best of his knowledge, as he testified, was irrelevant (the record does not support defendants' assertion that plaintiff confirmed Mr. Lettvin's understanding of this provision either at the time of contracting or when he testified at trial). The limiting words "to the best of his [or seller's] knowledge" were not included in the provision at issue. We will not read them into it. The next question is whether it is clearly evident in the record that defendants breached the provision.

Defendants assert that other than one brief instant when a puff of smoke came from an electrical outlet, being employed for a power tool used by a workman, there was not one instance of any problem with the electrical system and that plaintiff failed to establish that the electrical system was not in good working order as of the closing date. These assertions completely ignore Braverman's testimony.

Braverman testified that there were water-damaged conduits and wiring as well as wiring with the insulation worn off in the house. He also testified that the worn-off insulation posed a fire hazard. Finally, he testified, as previously noted, that defendants must have been aware that there was a problem, *i.e.*, water damage, with the electrical system because that problem would cause the circuit breakers and fuses in the home to blow out repeatedly.

The latter testimony was, alone, inadequate to clearly show that defendants knew of the water damage to the electrical system. However, it was adequate to clearly show that the water damage to the electrical system existed prior to the closing of the sale of the house. As such, it clearly showed that the electrical system was not in good

working order at that time. In this regard, we disagree with the trial court that an electrical system in a house is in good working order merely if all the lights work. Rather, to be in good working order, we believe it necessary that there be no major defects in or problems with the underlying wiring in that system. That requirement was clearly not met in this case. The trial court's judgment was thus against the manifest weight of the evidence on this aspect of count II.

Defendants next assert that the plumbing system was not shown to be in nonworking order. Specifically, they note the testimony of Arthur Kavanaugh, the project manager for Litvin Plumbing Company (Litvin), which plaintiff employed to do some work at the house. Kavanaugh testified that the downspouts in the house were not plugged, that the plumbing system was in good working order and that no problems in the downspouts were found by Litvin. Moreover, defendants question the value of testimony by Kavanaugh, upon which plaintiff relies on appeal, by asserting that it was given merely in response to hypothetical questions.

Notwithstanding Kavanaugh's testimony on direct examination by defendants' counsel, his testimony under cross-examination by plaintiff's counsel clearly revealed that the plumbing system was not in good working order prior to plaintiff's purchase of the house. Kavanaugh testified to the effect that Litvin was initially employed by plaintiff to merely determine whether the interior downspouts were clogged and that, in the course of making that determination, some downspouts may coincidentally have been unclogged. Thereafter, plaintiff's counsel questioned Kavanaugh regarding Litvin's use of a power rodding machine in addition to a tape to determine whether the downspouts were clogged. Under that questioning, Kavanaugh conceded that Litvin charged extra for removing obstructions from the downspouts and charged plaintiff for 19 hours of plumber labor and three hours of foreman labor. He also conceded that Litvin used three plumbers to rod out obstructions in the downspouts. Plaintiff's counsel then asked the following questions and received the following answers:

"Q. And if those downspouts were obstructed as revealed by your bill, the water would have been coming up in heavy rains ***?

A. Yes, sir.

Q. And it would have to be flowing down the interior walls ***?

A. Yes, sir.

Q. And if it flows the interior walls [*sic*], the downspout

isn't carrying out its intended function ***?

A. No sir."

The foregoing testimony was given in response to questions, which, while phrased as hypotheticals, were clearly based on the evidence adduced through Kavanaugh and others that, in fact, downspouts were clogged and many of the walls in the house were water damaged. Kavanaugh's testimony thus clearly established a probability that the water-damaged walls were the result of clogged downspouts. Earlier, Kavanaugh testified that the interior downspouts were part of the house's plumbing system. As such, the only reasonable conclusion from his testimony was that part of the plumbing system was not in good working order. In this regard, defendants disingenuously point to Kavanaugh's testimony that the gutters were not part of the plumbing system. That fact is irrelevant given Kavanaugh's concession that the downspouts, which were clogged, were part of that system. For that same reason and because it related more to the condition of the roof than the gutters and downspouts, defendants' citation to testimony by Kikes as disproving that the gutters were not the cause of the water damage to the walls is unavailing.

The foregoing testimony by Kavanaugh was not the only evidence that the plumbing system was not in good working order. Kavanaugh testified on direct examination that the plumbing system was in good working order, in part, because "the toilets flushed." However, plaintiff had earlier testified that the sewer line running from the house emptied into a ravine behind the house and that the Highland Park building inspector had said that the problem would have to be rectified. Referring to the foregoing evidence, plaintiff's counsel asked Kavanaugh whether the plumbing would not be in good working order as far as Highland Park officials were concerned unless the sewer problem was fixed. Kavanaugh agreed. Plaintiff's counsel also asked whether Litvin billed plaintiff $4,468 for fixing the sanitary sewer so that the plumbing "would work as intended" and whether, although it arose in the sanitary sewer, the problem rendered the plumbing "inoperable." Kavanaugh answered these questions affirmatively. The only reasonable conclusion from this testimony was that the plumbing system in the house was not in good working condition to the extent that it was affected by the sewer line emptying into the ravine. The trial court's conclusion to the contrary was thus against the manifest weight of the evidence.

■ Finally, with respect to a breach of the provision at issue as a result of problems with the garage doors and door opener, defendants

assert that there was no evidence that the garage door opener was constantly breaking down or that there was anything wrong with the garage doors themselves. They also rely on the reasoning of the trial court that the mechanical problem with the garage door opening system was merely a failure of design remedied by a state of the art installation that defendants did not choose to purchase, and that it was in good working order "though necessitating periodic repair."

Were it our function to determine the issues in this case *de novo*, we would not necessarily agree with the trial court that a garage door opener that needs periodic repair is in good working order. However, our function is merely to determine whether its conclusion that the system was in good working order was against the manifest weight of the evidence without regard to its specific rationale in so concluding. Reviewing the record in this case, we cannot say that standard is met here.

Plaintiff testified at trial that after moving into the house in May 1983, he learned that the garage door opening system only worked occasionally. However, there was no proof at trial that the garage door opening system did not work immediately upon plaintiff's taking possession of the house. Moreover, the invoice from American Automatic is dated five months after plaintiff took possession of the house. Thus, there was altogether insufficient evidence to clearly show that the garage doors were not in good working order at the time the sale of the house was closed. Moreover, unlike the problems with the downspouts, electrical system and sanitary sewer line, it could not be inferred simply from the nature of the problem with the garage door opening system that the system was not in good working order. The trial court's judgment was not against the manifest weight of the evidence on this aspect of count II.

### III

■ In their cross-appeal, defendants contend the trial court erred in denying their motion for section 2—611 sanctions against plaintiff. We find no need to address this issue at length. While not all of plaintiff's allegations were borne out by the evidence at trial, they were not so bereft of factual support that they can be said to have been made in bad faith. The record reveals a substantial amount of evidence in support of the parties' conflicting positions at trial. The trial court did not abuse its discretion in denying defendants' motion.

### IV

For all of the foregoing reasons, the judgment on count I of plain-

tiff's complaint is affirmed; the judgment on count II is reversed, judgment thereon is entered for plaintiff and the cause is remanded for a new trial on the issue of damages only; the denial of section 2—611 sanctions is affirmed.

Affirmed in part; reversed in part and remanded.

RIZZI and WHITE, JJ., concur.